**United States District Court**
For the Northern District of California

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7

8    SAN FRANCISCO BAYKEEPER,              Case No. C-09-5676 EMC

9              Plaintiff,                  **ORDER GRANTING PLAINTIFF'S AND
                                           DEFENDANT'S MOTIONS FOR**
10         v.                              **JUDICIAL NOTICE; GRANTING IN
                                           PART AND DENYING IN PART**
11   WEST BAY SANITARY DISTRICT,           **PLAINTIFF'S MOTION FOR PARTIAL
                                           SUMMARY JUDGMENT; GRANTING**
12             Defendant.                  **IN PART AND DENYING IN PART
                                           DEFENDANT'S OBJECTIONS TO**
13   _____/  **PLAINTIFF'S EVIDENCE IN SUPPORT
                                           OF MOTION**
14
                                           **(Docket Nos. 71, 82, 103, 104, 118, 120)**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

# TABLE OF CONTENTS

I.   BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

  A.   Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

  B.   Plaintiff's Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

  C.   SSO Discharge Reporting System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

  D.   Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

II.   LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

III.   DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

  A.   Requests for Judicial Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

  B.   Evidentiary Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

   1.   Declarations of Anna Fairbank, Terry Blanchard, Dudley Kenworthy, and Andrea Kopecky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

   2.   Corrected Declaration of Deborah Self . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

   3.   Declaration of Bruce Bell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

    a.   Whether the Bell Declaration is Inadmissible as Expert Opinion Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

     i.   Whether Dr. Bell's Testimony is Reliable . . . . . . . . . . . . .   20

     ii.   Whether Dr. Bell's Testimony is Relevant . . . . . . . . . . . . .   25

    b.   Whether the Bell Declaration is Inadmissible as Fact Witness Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

   4.   Hearsay Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

    a.   Hunt Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

    b.   Lucke Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

   5.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

  C.   Threshold Issues:  Standing and Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

|  | 1. | Whether the Baykeeper Members Have Suffered an Injury in Fact | ...... 32 |

1. Whether the Baykeeper Members Have Suffered an Injury in Fact ...... 32

2. Whether the Injury is Fairly Traceable to the Challenged Action of Defendant ........................................................... 37

3. Whether it is Likely that Plaintiff's Injury Will be Redressed by a Favorable Decision ................................................... 39

    a. Injunctive Relief ........................................... 39

    b. Civil Penalties ............................................ 40

4. Whether Plaintiff has Standing as an Organization ................... 42

5. Whether Plaintiff Provided Adequate Notice ........................ 43

6. Conclusion ................................................... 44

D. Whether There is No Genuine Dispute that Defendant's 68 SSOs Discharged Pollutants to Surface Waters ................................................... 44

1. Discharge .................................................... 46

    a. SSOs that Plaintiff Alleges Discharged Directly to Surface Waters ............................................... 46

        i. Spills 41, 51, 52, 61, 64, and 65 ...................... 47

        ii. Spill 63 ......................................... 48

        iii. Spills 5, 7, 19, 31, 38, 48, 54, and 59 ................. 49

        iv. Spills 43, 44, and 47 .............................. 49

        v. Spills 6 and 32 ................................... 50

        vi. Spill 9 .......................................... 50

        vii. Spill 33 ......................................... 50

        viii. Spill 13 ......................................... 50

        ix. Spill 1 .......................................... 51

        x. Conclusion ...................................... 51

    b. SSOs that Plaintiff Alleges Reached the MS4 and Discharged to Surface Waters ............................................... 51

United States District Court
For the Northern District of California

i.       Whether Plaintiff's Evidence Establishes the SSOs Discharged From the MS4 to Surface Waters . . . . . . . . . . . . . . . . . . . . .   52

ii.      SSOs That Spilled to the MS4 During or Immediately After a Significant Rain Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

iii.     SSOs That Spilled to the MS4 Without a Significant Rain Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   56

iv.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

c.    Multiple Spill Days . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

d.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   58

2.    Waters of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

a.    San Francisquito Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

b.    West Point Slough . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   62

c.    Atherton Channel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

d.    Los Trancos Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

e.    Corte Madera Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   64

f.    Ravenswood Slough . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

g.    Bayfront Canal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

h.    Redwood Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

i.    Bovet Creek . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

j.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

3.    NPDES Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

a.    MS4 Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

b.    Waste Treatment System Exemption . . . . . . . . . . . . . . . . . . . . . . .   73

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Before the Court is Plaintiff San Francisco Baykeeper's ("Plaintiff") Motion for Partial Summary Judgment.  Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot."), Dkt. No. 71.  In its motion, Plaintiff seeks judgment against Defendant West Bay Sanitary District ("Defendant") on the grounds that Defendant discharged pollutants into Waters of the United States in violation of the Clean Water Act.  Pl.'s Mot. 1, Dkt. No. 71.  Also before the Court are the parties' Requests for Judicial Notice, (Dkt. Nos. 82, 103), and Defendant's Objections to Evidence Submitted in Support of Plaintiff's Motion, (Dkt. No. 104).[1]  After considering the parties' briefs, the arguments raised at the March 9, 2011 hearing, and the entire record of this case, the Court **GRANTS** each party's Motion for Judicial Notice, **GRANTS IN PART AND DENIES IN PART** Defendant's Objections to Evidence, and **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for partial summary judgment for the reasons set forth herein.

## I.   BACKGROUND

Plaintiff is a nonprofit corporation dedicated to protecting and enhancing the water quality of the San Francisco Bay-Delta Estuary and its tributaries for the benefit of its ecosystems and the surrounding communities.  Self Decl. ¶¶ 2, 4, Dkt. No. 96.  Defendant is the political entity that owns and operates the sewage collection system (the "Collection System") serving some 55,000 people in the City of Menlo Park and parts of East Palo Alto, Redwood City, Atherton, Woodside, Portola Valley, and unincorporated San Mateo and Santa Clara Counties.  Compl. & Answer ¶¶ 21-24, Dkt. Nos. 1, 11.  The Collection System, which is made up of 210 miles of sewer line, conveys sewage to the Menlo Park Pumping Station and from there to the South Bayside System Authority ("SBSA") Wastewater Treatment Plant, which is jointly owned and operated by Defendant and three municipalities – Belmont, San Carlos, and Redwood City.  Compl. & Answer ¶¶ 24-25, 28-29, Dkt. Nos. 1, 11.

---

[1] On March 2, 2011, Defendant also submitted Objections to Evidence Submitted in Support of Plaintiff's Reply; specifically, Exhibit J to the Reply Declaration of Daniel Cooper.  Dkt. No. 106, 108.  However, as the Court has not considered Exhibit J in its decision, the Court **DENIES** Defendant's request as moot.

A.      Statutory Background

The Clean Water Act ("CWA"), 33 U.S.C. §1251-1376, is intended to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In pursuit of this goal, section 301(a) of the Act prohibits the "discharge of any pollutant" into navigable waters from any "point source" without a permit. 33 U.S.C. § 1311(a) (except as otherwise provided in the Act, the discharge of any pollutant by any person shall by unlawful). "Discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12)(A); *Rapanos v. United States*, 547 U.S. 715, 723 (2006). And "navigable waters" means "Waters of the United States." 33 U.S.C. § 1362(7). "The phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Rapanos*, 547 U.S. at 739. EPA regulations further define "waters of the United States," but include an exception: "Waste treatment systems, including treatment ponds or lagoons . . . are not waters of the United States." 40 C.F.R. § 122.2.

The EPA is also required to regulate stormwater discharges "to protect water quality." 33 U.S.C. § 1342(p)(6). The EPA's stormwater discharge regulations, 40 C.F.R. § 122.26, define a Municipal Separate Storm Sewer ("MS4") as a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains) owned or operated by a public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, used for collecting or conveying storm water. 40 C.F.R. § 122.26. Unlike a sanitary sewer system, which transports municipal sewage for treatment at a wastewater facility, or a combined sewer system, which transports sewage and stormwater for treatment, MS4s contain and convey only untreated stormwater. *See* 40 C.F.R. § 122.26(a)(7), (b)(8).

CWA § 402 provides for the issuance of a permit under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C § 1342(a). A NPDES permit allow the holder to discharge pollutants notwithstanding the general prohibition imposed by § 301(a). *Id.* The NPDES permitting program is the "centerpiece" of the CWA and the primary method for enforcing the

United States District Court

For the Northern District of California

1  effluent and water-quality standards established by the EPA and state governments.  *Natural Res.*

2  *Def. Council, Inc. v. Cnty. of Los Angeles*, --- F.3d ----, 2011 WL 815099 (9th Cir. 2011) (citations

3  omitted).  NPDES permits may be issued by the EPA or by state agencies that have been duly

4  authorized by the EPA.  *Id.* § 1342(a)-(b).  In California, the NPDES program is administered by the

5  State Water Resources Control Board.  Cal. Water Code § 13267(b)(1); Pl.'s Req. for Judicial

6  Notice ("RJN") Ex. B.

7  B.    Plaintiff's Allegations

8        Plaintiff initiated this suit against Defendant under the citizen suit provisions of the CWA, 33

9  U.S.C. § 1365.  Plaintiff's Complaint seeks a judgment declaring that Defendant has discharged

10  pollutants from its Collection System without a permit, in violation of the CWA, an injunction

11  preventing Defendant from discharging pollutants without a NPDES permit, and civil penalties for

12  the alleged discharges.  Compl. ¶ 123, Dkt. No. 1.

13        In its Complaint, Plaintiff alleges that Defendant discharges sewage (commonly referred to

14  as "sanitary sewer overflows" or "SSOs") to San Francisco Bay and its tributaries without a permit.

15  Plaintiff alleges that SSOs from the Collection System result in the discharge of pollutants into

16  "waters of the United States" directly, as well as indirectly via the MS4 owned and operated by the

17  cities and counties Defendant serves.  It is undisputed that the Collection System has overflowed and

18  discharged raw or partially treated sewage at least 162 times since September 28, 2004.  Compl. &

19  Answer ¶¶ 34, 101, Dkt. Nos. 1, 11.

20        Plaintiff alleges that Defendant self-reported hundreds of SSOs from its Collection System

21  between October 3, 2004 and the present, spilling at a rate of over 30 SSOs per 100 miles of sewer

22  line per year.[2]  Self Decl. ¶ 17, Dkt. No. 96; Compl. ¶¶ 34-35, Dkt. No. 1.  Plaintiff alleges that

23  Defendant's SSOs have discharged to Ravenswood Slough, West Point Slough, Atherton

24  Channel, Redwood Creek, San Francisquito Creek, Los Trancos Creek, Bovet Creek, and Corte

25  Madera Creek, and that these waters are all tributaries of San Francisco Bay.  Bell Decl., ¶¶ 28-36,

26  Attach. 5, Table 2, Dkt. No. 73.

27  _____

28        [2] A five year statute of limitations applies under the CWA, tolled 60 days for a "notice of
intent to sue" period.  *Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1520-24 (9th Cir. 1987).

United States District Court

For the Northern District of California

1    Of these alleged spills, the present motion for partial summary judgment focuses on 68.  For

2    identification purposes, Plaintiff provided a table listing the 68 SSOs at issue in the present motion.

3    Hunt Decl. ¶ 4, Ex. A, Dkt. No. 83.  The table has columns containing an identifying number for

4    each specific SSO, as well as each SSO's location, date, and reported volume in gallons, and a

5    column for the name of related surface waters.  Plaintiff alleges that these SSOs discharged for 79

6    days, in two categories: (1) 23 SSOs that Defendant reported discharged to surface waters and (2) 45

7    SSOs of 100 gallons or more reported as reaching the MS4 and into surface waters.  Bell Decl. ¶¶

8    21-22, Attach. 5, Dkt. No. 73.  Plaintiff alleges that this spill rate demonstrates serious problems

9    with Defendant's operation and maintenance of the Collection System.  Self Decl. ¶ 17, Dkt. No. 96;

10   Compl. ¶¶ 34, 39-42, Dkt. No. 1.

11   C.   SSO Discharge Reporting System

12   The EPA has authorized the State of California to develop water-quality standards and issue

13   NPDES permits.  Under the Porter-Cologne Water Quality Control Act, California state law

14   designates the State Water Resources Control Board and nine regional boards as the principal state

15   agencies for enforcing federal and state water pollution law and for issuing permits.  *See* Cal. Water

16   Code §§ 13000, 13001, 13140, 13240, 13370, 13377.  Pursuant to the California Water Code section

17   13267, the California Regional Water Quality Control Board, San Francisco Region (the "Regional

18   Board") has the authority to require any person who has discharged or is suspected of discharging to

19   furnish, under penalty of perjury, technical or monitoring program reports.  Cal. Water Code §

20   13267(b)(1).  Defendant has been required to report all SSOs under one of two reporting systems

21   during the five-year statutory period.  Since May of 2007, Defendant has reported all SSOs to the

22   California Integrated Water Quality System ("CIWQS") online database pursuant to the California

23   State Water Resources Control Board Order No. 2006-0003-DWQ.  Pl.'s RJN Ex. B at 13, 15, 25;

24   Ex. C at 34-39.  Prior to May of 2007, Defendant filed its SSO reports pursuant to a November 15,

25   2004 letter issued by the Regional Board, which required Defendant to file spill reports for all SSOs

26   of 100 gallons or more and to report all spills, including those under 100 gallons, in an Annual

27   Report.  *Id.* Ex. D at 43-44.

28

8

United States District Court

For the Northern District of California

1    Defendant also keeps internal records of individual SSOs and spreadsheets summarizing

2  SSOs by year.  Bell Decl. ¶¶ 19-20, Dkt. No. 73; Hunt Decl. Ex. D, Dkt Nos. 85-87, 89-90, 92-94.

3  These reports include the date and address of the pertinent SSO, the SSO volume, whether the

4  overflow was contained, whether any of the SSO was retrieved and returned to the Collection

5  System, and whether the SSO discharged to a creek, channel, culvert, or drainage system, and if so

6  the estimated volume that discharged.  Hunt Decl. Ex. D, Dkt Nos. 85-87, 89-90, 92-94.

7  D.    Procedural Background

8        Plaintiff filed its Complaint on December 2, 2009, alleging three causes of action.  Count I

9  asserts that Defendant is in violation of the CWA for discharging pollutants into waters of the

10  United States without a permit; Count II asserts that Defendant failed to comply with certain

11  mandatory duties under the California Porter-Cologne Act, Cal. Water Code § 13376, which

12  prohibits the discharge of pollutants to waters of the United States except in compliance with waste

13  discharge requirements; Count III alleges that Defendant's discharges violated several municipal

14  ordinances and codes.  Compl. 16-20, Dkt. No. 1.

15       On November 17, 2010, Defendant filed a Motion for Judgment on the Pleadings.  Def.'s

16  Mot. for J. on the Pleadings ("Def.'s Mot."), Dkt. No. 43.  In its motion, Defendant sought judgment

17  on portions of the CWA claims raised in Count I as well as Plaintiff's state law claims.

18  Alternatively, Defendant requested that the Court decline to exercise supplemental jurisdiction over

19  the state law claims.

20       As to Plaintiff's CWA claims, Defendant challenged those portions of Count I related to

21  discharges from its Collection System that did not reach waters of the United States, but instead

22  entered MS4s.  Def.'s Mot. 5, Dkt. No. 43.  However, at the December 22, 2010 hearing on

23  Defendant's motion, Plaintiff agreed that any SSO discharges into MS4s that did not go on to reach

24  "waters of the United States" would be outside the scope of this lawsuit, though Plaintiff did not

25  concede that such discharges could never be actionable as a matter of law.  Accordingly, because

26  Defendant did not contend and did not proffer any evidence that none of the SSOs reached waters of

27  the United States, the Court denied Defendant's motion as to this cause of action.  Order Granting in

28  Part and Denying in Part Def.'s Mot. for J. on the Pleadings ("Order"), Dkt. No. 70.

9

As to the state law claims, Defendant argued that no private right of action for citizens exists to enforce the relevant municipal laws, and that Plaintiff's cause of action seeking to do so was not appropriately brought under state law, or in federal court through supplemental jurisdiction. Def.'s Mot. 8, Dkt. No. 43. Alternatively, Defendant argued that the Court should decline to exercise supplemental jurisdiction over the claims because they were not part of the same case or controversy, and because the claims raised novel or complex issues. Def.'s Mot. 13-14, Dkt. No. 43. The Court agreed that Plaintiff's cause of action raised novel and complex issues of state law, finding that there appears to be little precedent in the area and neither party cited any case authority akin to the circumstances in the present case. Order at 7-10, Dkt. No. 70. Further, the Court found that resolution of Count III would involve the expenditure of substantial additional judicial time and effort because it encompassed a larger subset of spills than the remaining counts, and that each discharge into the MS4s would be relevant, even if the discharge is not shown to have reached "waters of the United States." Order at 10, Dkt. No. 70. Accordingly, the Court declined to exercise supplemental jurisdiction over Count III. Order at 10, Dkt. No. 70.

On January 31, 2011, Plaintiff filed the present motion for summary judgment. Dkt. No. 71. Defendant filed its Opposition on February 16, 2011, (Dkt. No. 97), and Plaintiff filed a Reply on February 23, 2011 (Dkt. No. 105). Both parties also filed Requests for Judicial Notice. Dkt. Nos. 82, 103. Defendant has also filed Objections to certain evidence submitted by Plaintiff in support of its motion, (Dkt. #104), to which Plaintiff filed a response on February 23, 2011. (Dkt. No. 107).

On November 18, 2010, the Court granted the parties' stipulation to dismiss Plaintiff's second cause of action. Dkt. No. 46.

On March 9, 2011, the Court held a hearing on the matter. Daniel Cooper appeared on behalf of Plaintiff, and Melissa Thorme and Anthony Condotti appeared on behalf of Defendant.

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56(a), the Court shall grant summary judgment as to any claim or defense if the movant, by citing to particular parts of materials in the record, shows that there "is no genuine dispute as to any material fact and the movant is entitled to

**United States District Court**
For the Northern District of California

1   judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)[3]; *see Anderson v. Liberty Lobby, Inc.*, 477

2   U.S. 242, 247-48 (1986).  A fact is material if, under the substantive law  governing the claim or

3   defense at issue, the fact is critical and might affect the outcome of the case.  *See Anderson*, at 248.

4   A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to

5   return a verdict for the non-moving party.  *See id.* at 248-49.

6        The party moving for summary judgment has the initial burden of citing to particular parts of

7   materials in the record, including portions of the pleadings, discovery and disclosures on file, and

8   affidavits, that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 323 (1986).  When the nonmoving party has the burden of proof at trial, the

10  movant need point out only "that there is an absence of evidence to support the nonmoving party's

11  case."  *Id.* at 325.  If the movant meets this initial burden, the non-moving party must go beyond the

12  pleadings and–by its own affidavits or discovery–set forth specific facts showing a genuine issue for

13  trial.  *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

14  586-87 (1986).  If the non-moving party does not produce evidence to show a genuine dispute as to a

15  material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477 U.S. at 323.  In

16  ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in

17  the light most favorable to the non-moving party.  *See Matsushita*, 475 U.S. at 587.

18              **III.   DISCUSSION**

19  A.      Requests for Judicial Notice

20        Plaintiff and Defendant both filed Requests for Judicial Notice.  Dkt. Nos. 82, 103, 118, 120.

21  Neither party raised any objections to the requests.

22        Plaintiff requests that the Court take judicial notice of Defendant's sewer system

23  management plan; public records and orders from the Regional Board; provisions from the San

24  Mateo County and Santa Clara County Ordinances; municipal code sections from East Palo Alto,

25  Atherton, Menlo Park, Woodside Portola Valley, and Redwood City; and website pages from the

26  ────────────────

27        [3] On December 1, 2010, a revised version of Rule 56 took effect.  While portions of former
    Rule 56 have been amended, the Committee notes to the 2010 Amendments to Rule 56 indicate that
28  the standard for granting summary judgment remained unchanged and do not affect court decisions
    construing and applying the language of Rule 56.

**United States District Court**
For the Northern District of California

1   South Bay Salt Pond Restoration Project, which is managed by an Executive Leadership Group that

2   is comprised of employees of federal, state, and local government agencies.  Pl.'s RJN Exs. A-O,

3   Dkt. No. 82.  In support of supplemental briefing, Plaintiff also requests that the Court take judicial

4   notice of a hearing transcript from this case, excerpts from certain NPDES permits, and a response to

5   written comments related to a NPDES permit.  Dkt. 120.

6        Defendant requests that the Court take judicial notice of a Mercury Total Maximum Daily

7   Load authored by the Regional Board; a water appropriation decision issued by the Regional Board,

8   dated October 20, 2009; and excerpts of the State Water Resources Control Board's 2006 CWA

9   section 303(d) impaired waterbodies list, which shows listings and sources for lower and south San

10  Francisco Bay and San Francisquito Creek.  Thorme Decl. Exs. G, I, J, Dkt. No. 99.  In support of

11  supplemental briefing, Defendant also requests that the Court take judicial notice of certain NPDES

12  permits.[4]  Dkt. 118.

13       Federal Rule of Evidence ("FRE") 201(b) provides the criteria for judicially noticed facts:

14  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1)

15  generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and

16  ready determination by resort to sources whose accuracy cannot reasonably be questioned."  It is

17  well established that records, reports, and other documents on file with administrative agencies –

18  such as the State Water Resources Control Board – are judicially noticeable.  *Lee v. City of Los*

19  *Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); *see also al-Kidd v. Ashcroft*, 580 F.3d 949, 954 fn. 6

20  (9th Cir. 2009); *Marsh v. San Diego Cnty.*, 432 F. Supp. 2d 1035, 1043-45 (S.D. Cal. 2006).  City

21  ordinances are also proper subjects for judicial notice.  *Santa Monica Food Not Bombs v. City of*

22  *Santa Monica*, 450 F.3d 1022, 1025 fn. 2 (9th Cir. 2006).

23       As neither party has raised any objections to the requests for judicial notice, and the requests

24  are not subject to reasonable dispute in that they are capable of accurate and ready determination,

25  the Court GRANTS the parties requests for judicial notice.

26

27       [4] Defendant further asks that judicial notice be taken of certain documents attached to one of
    its attorney's declarations.  Because the documents have been authenticated via an attorney
28  declaration, the request for judicial notice is moot.

**United States District Court**
For the Northern District of California

1   B.      Evidentiary Objections

2          On February 16, 2011, Defendant filed Objections to Evidence Submitted in Support of

3   Plaintiff's Motion for Partial Summary Judgment.  Dkt. No. 104.  The Court shall consider each

4   objection in turn.

5          1.      Declarations of Anna Fairbank, Terry Blanchard, Dudley Kenworthy, and Andrea

6                  Kopecky

7          Defendant first objects to the declarations of three of its standing witnesses – Anna Fairbank,

8   Terry Blanchard, and Dudley Kenworthy – and the declaration of fact witness Andrea Kopecky on

9   the grounds that Plaintiff failed to identify these witnesses through initial or supplemental

10  disclosures, or by signed disclosures required by FRCP 26(a), (e) and (g).  Defendant states that

11  Plaintiff did not list these witnesses in its initial disclosures, nor has it supplemented its initial

12  disclosures to later identify them.  Defendant argues that it had no notice that these witnesses even

13  existed until Plaintiff filed its motion for partial summary judgment.

14         In response, Plaintiff maintains that the declarations and supporting exhibits were timely

15  disclosed with their motion, and that FRCP 26(e) specifies no particular timeframe for

16  supplementation.  Plaintiff argues that identifying witnesses willing to subject themselves to the

17  rigors of litigation takes time, yet it was able to provide Defendant with the names of two other

18  standing witnesses, Robert Fairbank and Deborah Self, in its initial disclosures sent in March of

19  2010.  Plaintiff states that it continued to investigate potential standing witnesses as it prepared its

20  motion, and was therefore able to produce the three additional standing witness declarations with the

21  motion.  As to Ms. Kopecky's declaration, Plaintiff states that the need for her investigation did not

22  arise until Plaintiff's engineer determined that there were omissions in the maps of the storm sewers

23  within Defendant's service area.  Thus, Ms. Kopecky, who is employed by Plaintiff as a Legal

24  Associate, went to the locations where Defendant documented spills and confirmed the portions of

25  the storm sewer that were missing from the maps by taking pictures and comparing GPS readings.

26  Kopecky Decl. ¶¶ 1, 12-13, Dkt. No. 75.  On January 25, 2011, Plaintiff sent Defendant

27  supplemental disclosures consisting of, among other documents, 124 photographs taken by Ms.

28

13

United States District Court
For the Northern District of California

1   Kopecky that Plaintiff intended to rely upon in bringing its motion.  Cooper Reply Decl. ¶ 8, Dkt.

2   No. 106.

3          Pursuant to FRCP 26(a), a party must, without awaiting a discovery request, provide to the

4   other party the name of each individual likely to have discoverable information that the disclosing

5   party may use to support its claims or defenses.  Fed. R. Civ. P. 26(a)(1)(A)(I).  "May use" includes

6   any use to support a pretrial motion.  *See* Adv. Comm. Notes to 2000 Amendment to Fed. R. Civ. P.

7   26(a)(1).  However, this mandatory early disclosure is limited to information reasonably available to

8   the party.  Fed. R. Civ. P. 26(a)(1)(E).  "Reasonably available" covers information known to a party,

9   its agents and counsel, as well as information obtainable through reasonable investigation.  *See* Adv.

10  Comm. Notes to 1993 Amendment to Fed. R. Civ. P. 26(a).  Parties have an ongoing duty to

11  supplement their initial disclosures "in a timely manner" upon determining that the initial

12  disclosures are materially incomplete or inaccurate.  Fed. R. Civ. P. 26(e)(1)(A).

13         A party who fails to make the required initial disclosure "is not allowed to use that

14  information or witness to supply evidence on a motion, at a hearing, or at trial," except where the

15  failure to comply was "substantially justified" or "harmless."  Fed. R. Civ. P. 37(c)(1); *Hoffman v.*

16  *Constr. Protective Serv., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008).  In determining whether to

17  preclude introduction of evidence pursuant to FRCP 37, courts consider "(1) the surprise to the party

18  against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the

19  extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence,

20  and (5) the nondisclosing party's explanation for it failure to disclose the evidence."  *Dey, L.P v.*

21  *Ivax Pharm., Inc.*, 233 F.R.D. 567, 571 (C.D. Cal. 2005) (citing *S. States Rack & Fixture, Inc. v.*

22  *Sherwin-Williams Co.*, 318 F.3d 592 (4th Cir. 2003)).

23         Here, the Court finds that Plaintiff's failure to disclose these four witnesses prior to filing its

24  motion was substantially justified and harmless.  As to the first factor, the purpose of Anna

25  Fairbank, Terry Blanchard, and Dudley Kenworthy's declarations is to establish Plaintiff's standing

26  to bring the present claim.  Although Plaintiff did not provide Fairbank, Blanchard, and

27  Kenworthy's individual names as part of its initial and supplemental disclosures, Defendant cannot

28  say it is surprised that Plaintiff would submit declarations from its members stating their use of the

United States District Court

For the Northern District of California

1    waters of the Bay and its tributaries.  Further, Plaintiff provided Defendant with the names of two

2    other standing witnesses, Robert Fairbank and Deborah Self, in its initial disclosures sent in March

3    of 2010.  As all five declarations serve the same purpose – to establish standing – the Court finds

4    that the first factor weighs in favor of allowing the witnesses' declarations.

5          As to fact witness Andrea Kopecky, Plaintiff provided Defendant supplemental disclosures

6    on January 25, 2011, including 124 photographs taken by Kopecky related to omissions in the maps

7    of the storm sewers within Defendant's service area.  Cooper Reply Decl. ¶ 8, Dkt. No. 106.  As

8    Kopecky's declaration concerns the photographs and related investigation, the Court finds that the

9    first factor also weighs in favor of allowing Kopecky's declaration.

10         As to the second factor, the ability of the proponent of sanctions to cure the surprise, the

11   Court finds that this factor is neutral.  The Court recognizes that, given the timing of the

12   declarations, Defendant has had limited time to cure any surprise.  However, Defendant has not

13   identified any prejudice it has suffered by the timing of the declarations.  As discussed above, the

14   declarations address standing issues, which cannot be considered a surprise, and photographs that

15   Defendant obtained in supplemental disclosures.  Further, Plaintiff states that it made all of its

16   standing witnesses available for deposition before Defendant's opposition was due, yet Defendant

17   has taken none of these witnesses' depositions.  Cooper Reply Decl. ¶¶ 10-12, Exs. E & F, Dkt. No.

18   106.

19         For similar reasons, the third factor – the likelihood that introduction of evidence will disrupt

20   the trial – weighs against preclusion.  For purposes of standing, Plaintiff has submitted five

21   declarations, and Defendant has provided no objections to two of them.  While Defendant objects to

22   the timeliness of three of the declarations, its opposition to Plaintiff's motion raises no issues related

23   to the statements made in those declarations.  As to Andrea Kopecky's declaration, the Court finds

24   that her declaration goes directly establishing a dispute issue in this case – precise locations of the

25   SSOs – and addresses omissions in the maps of the storm sewers within Defendant's service area.

26   Thus, there is no indication that the introduction of this evidence will disrupt the proceedings.

27         The final two factors – the importance of the evidence and the proponent's explanation for

28   failure to offer it earlier – also weigh against preclusion.  First, the Court finds that the declarations

15

United States District Court

For the Northern District of California

1   are important to Plaintiff's case.  As to the standing witnesses, these witnesses provide additional

2   support for Plaintiff's standing.  As to fact witness Andrea Kopecky, her declaration is directed

3   toward alleged omissions in the maps of the storm sewers within Defendant's service area, which

4   Plaintiff states did not arise until Plaintiff's engineer determined that there were omissions in the

5   maps of the storm sewers within Defendant's service area.  While the location methods described

6   therein are discussed below, *see* Section III(D)(1)(b)(I), *infra*, the Court finds the location of spills

7   within the MS4 is important to the Court's consideration of this case.

8          Second, the Court finds that Plaintiff's timing on disclosing these witnesses and documents

9   was substantially justified because its investigation into the elements of the case was ongoing while

10  preparing the summary judgment motion.  Plaintiff states that identifying witnesses willing to

11  subject themselves to the rigors of litigation takes time, and that it continued to investigate potential

12  standing witnesses throughout the course of this litigation.  As another judge in this district has

13  recognized, supplemental disclosure of declarations with a summary judgment motion is, in certain

14  instances, acceptable: "As the deadline for summary judgment nears in any civil case, it is

15  customary for counsel to solicit declarations . . . .   In this process, it would be unreasonable and

16  burdensome (and rarely, if ever, done in practice) to require all sides to augment any . . . disclosure

17  lists each and every time they obtain a declaration for potential use on summary judgment."  *Intel*

18  *Corp. v. Via Tech., Inc.*, 204 F.R.D. 450, 451 (N.D. Cal. 2001).

19         Finally, the Court notes that if the timing of Plaintiff's disclosure was a serious concern to

20  Defendant, it could have moved under FRCP 56(d) for more time to oppose the motion and seek to

21  obtain discovery in the interim.  *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or

22  declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the

23  court may: . . . (2) allow time to obtain affidavits or declarations or to take discovery."  Defendant

24  made no such request.  Defendant did not do so.

25         Based on this analysis, the Court DENIES Defendant's request that it disregard the

26  declarations of Anna Fairbank, Terry Blanchard, Dudley Kenworthy, and Andrea Kopecky.

27

28

**United States District Court**
For the Northern District of California

2.       <u>Corrected Declaration of Deborah Self</u>

As part of its motion for partial summary judgment, Plaintiff filed the Declaration of Deborah Self in support thereof.  Dkt. No. 76.  On February 9, 2011, Plaintiff filed a corrected version of Ms. Self's declaration.  Dkt. No. 96.  In so doing, Defendant argues that Plaintiff violated the Court's Civil Local Rules, which provide that a motion must be accompanied by affidavits or declarations.  Civil L.R. 7-2(d), 7-5.  Based on these local rules, Defendant argues that it follows that an affidavit or declaration must be filed concurrently with the motion, and that Plaintiff is attempting to circumvent the local rules by filing the corrected version of Ms. Self's declaration.  Defendant also points out that Plaintiff filed the revised declaration one-and-a-half weeks after it filed its motion and just five business days before Defendant's opposition was due, arguing that this delay is a tactic used by Plaintiff to gain a litigation advantage.  Defendant argues that the corrected declaration contains substantive changes, and it provides a redlined version comparing the original declaration with the corrected version.  Thorme Decl. ¶ 13m Ex. H, Dkt. No. 99.

In response, Plaintiff states it did not discover that it filed a draft version of Deborah Self's Declaration until February 8, 2011, when it was preparing for her deposition.  Plaintiff argues that it complied with the rules and appropriately corrected the error and provided ample time for Defendant to inquire into the correction.  Plaintiff points out that Defendant conducted no inquiry into the differences during Ms. Self's deposition.

Upon review of the parties' arguments, the Court finds no reason to preclude the corrected declaration.  First, Plaintiff properly submitted Ms. Self's original declaration with its motion pursuant to Civil Local Rules 7-2 and 7-5.  Although Defendant appears to argue that the Court can only consider a declaration if it is submitted concurrently with the motion, this would not allow for any corrections to be made once a motion has been filed.  Defendant provides no authority for this argument, and the Court is aware of none.  Second, Plaintiff filed and served the corrected declaration in compliance with the ECF procedures for correcting errors.  Cooper Suppl. Decl. ¶ 4, Dkt. No. 95.  Third, Defendant identifies no substantive dispute with the corrections.  Finally, Plaintiff served the corrected declaration five days prior to Ms. Self's deposition, yet Defendant did not inquire into the corrections, either before or during the deposition.  Defendant suffered no

**United States District Court**
For the Northern District of California

1  prejudice.  Accordingly, the Court DENIES Defendant's request that it disregard the corrected

2  declaration of Deborah Self.

3          3.      Declaration of Bruce Bell

4          Defendant next objects to the declaration of Bruce Bell, Ph.D., Plaintiff's expert, Dkt. No.

5  73, on the grounds that the declaration fails to comply with Federal Rules of Evidence 402, 403, and

6  702.  Defendant cites generally to these rules and provides no specific case law in support of its

7  arguments.  In the alternative, West Bay objects to Dr. Bell's declaration on the grounds that

8  Plaintiff failed to identify him as a fact witness through initial or supplemental disclosures, or by

9  signed disclosures required by FRCP 26(a), (e) and (g), and that as a fact witness, his declaration

10  fails to meet the requirements of Civil Local Rule 7-5.

11          a.      Whether the Bell Declaration is Inadmissible as Expert Opinion Testimony

12          Defendant's first argument is that Dr. Bell's declaration is inadmissible as expert opinion

13  testimony.  Defendant breaks down its objections into groups of paragraphs contained in Dr. Bell's

14  declaration; however, Defendant's objections can be summarized as follows: (1) Dr. Bell fails to

15  provide sufficient data to support his conclusions; and (2) Dr. Bell fails to utilize reliable principles.

16          Federal Rule of Evidence ("FRE") 702 governs the admissibility of expert testimony.

17  Pursuant to FRE 702, a witness qualified as an expert in "scientific" knowledge may testify thereto

18  if: "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of

19  reliable principles and methods; and (3) the witness has applied the principles and methods to the

20  facts of the case."  Fed. R. Evid. 702.  The trial court acts as a gatekeeper to the admission of expert

21  scientific testimony under FRE 702.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93

22  (1993).  Under *Daubert*, the Court must conduct a preliminary assessment to "ensure that any and all

23  scientific testimony or evidence admitted is not only relevant but reliable."  *Id.* at 589.  This

24  two-step assessment requires consideration of whether (1) the reasoning or methodology underlying

25  the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or

26  methodology properly can be applied to the facts in issue (the relevancy prong).  *Id.* at 592-93;

27  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

28

18

1    Reliable testimony must be grounded in the methods and procedures of science and signify

2    something beyond "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  The

3    inferences or assertions drawn by the expert must be derived by the scientific method.  *Id.*  In

4    essence, the court must determine whether the expert's work product amounts to "'good science.'"

5    *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (quoting

6    *Daubert*, 509 U.S. at 593).  In *Daubert*, the Supreme Court outlined factors relevant to the reliability

7    prong, including: (1) whether the theory can be and has been tested; (2) whether it has been

8    subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or

9    methodology employed is generally accepted in the relevant scientific community.  *Daubert*, 509

10   U.S. at 593-94.

11   The relevancy or "fit," prong requires that the testimony be "relevant to the task at hand, . . .

12   i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d

13   at 1315 (quoting *Daubert*, 509 U.S. at 597).  Relevancy requires opinions that would assist the trier

14   of fact in reaching a conclusion necessary to the case.  *Kennedy v. Collagen Corp.*, 161 F.3d 1226,

15   1230 (9th Cir. 1998).

16   The proponent of the evidence must prove its admissibility by a preponderance of proof.

17   *Daubert*, 509 U.S. at 593 n. 10.

18                   i.       Whether Dr. Bell's Testimony is Reliable

19   First, the Court must determine whether Dr. Bell's testimony "is the product of reliable

20   principles and methods."  Fed. R. Evid. 702.  Expert opinion testimony is deemed sufficiently

21   reliable if the expert has "good grounds" for his testimony – i.e., if the expert's conclusions are

22   based on the knowledge and experience of his discipline rather than on "subjective belief or

23   unsupported speculation."  *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

24   137, 147-48 (1999).  The proponent need not prove that the expert's testimony is correct, but he or

25   she must prove by a preponderance of the evidence that the testimony is reliable.  *Moore v. Ashland*

26   *Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

27   Here, Dr. Bell sets out his background and qualifications in paragraphs 1-6 of his declaration,

28   to which Defendant has filed no objections.  Dr. Bell holds bachelors and masters degrees in civil

1   engineering and a Ph.D. in environmental engineering, and he has over 40 years experience in

2   environmental engineering.  Bell. Decl. ¶ 3, Dkt. No. 73.  His experience includes design and

3   evaluation of wastewater treatment plants and collection systems and infiltration and inflow

4   reduction studies.  *Id.*  He has been recognized as an expert in environmental engineering over ten

5   times by federal courts, including two cases regarding SSOs.  *Id.* ¶ 4.  Dr. Bell also has experience in

6   designing storm sewers, preparing stormwater management plans, and evaluating the adequacy of

7   stormwater management systems.  *Id.* ¶ 5.  He has designed storm sewers, storm sewer systems, and

8   prepared stormwater management plans for facilities ranging from residential development to a

9   6,500 acre U.S. Army laboratory.  *Id.*  He also has extensive experience in evaluating the impacts of

10  pollutants contained in municipal wastewaters on receiving waters, including water quality

11  monitoring to determine the allowable amount of pollutants that may be discharged without

12  exceeding water quality standards; determining the impact of pollutants discharged to receiving

13  waters; and determining the distance that bacterial and organic pollutants travel prior to dying or

14  being consumed.  *Id.* ¶ 6.  Based on this background, the Court finds no reason to question Dr. Bell's

15  qualifications to act as an expert witness in this case.

16         Despite Dr. Bell's qualifications, Defendant argues that his testimony is inadmissible

17  because it fails to provide sufficient facts and data to support his opinion about the composition of

18  Defendant's sewage.  Specifically, in paragraphs 7-15, Dr. Bell provides a background on SSOs,

19  including common pollutants contained therein, and states that Defendant's SSOs contain pollutants.

20  *Id.* ¶¶ 7-15.  In support of his testimony, Dr. Bell refers to Defendant's own Sewer System

21  Management Plan, analytical data of samples of the sewage waste stream to which Defendant

22  contributes, a report to Congress prepared by the EPA, a scientific article on pathogen survival, and

23  his over 40 years of experience as a scientist and engineer.  *Id.* n.7-21.  Defendant does not object to

24  the reliability of the information on which Dr. Bell relies to support his opinion.  The Ninth Circuit

25  has indicated that independent research, rather than research conducted for the purposes of litigation,

26  carries with it the indicia of reliability.  *Daubert II*, 43 F.3d at 1317.  In particular, using

27  independent, pre-existing research "provides objective proof that the research comports with the

28  dictates of good science" and is less likely "to have been biased by the promise of remuneration."

United States District Court

For the Northern District of California

*Id.* Further, experts may express opinions based on information made known to them through means other than the expert's own percipient observation, including reports, studies, and literature. Fed. R. Evid. 703 advisory committee's notes. The facts or data relied upon need not be admissible in evidence so long as of a type reasonably relied on by experts in the particular field in forming opinions or inferences on the subject. Fed. R. Evid. 703. As Dr. Bell's declaration provides independent resources on which he based his opinion, the Court finds no reason to question its reliability. Moreover, Defendant's objection seems to focus on whether Dr. Bell's conclusions are correct. However, the proponent need not prove that the expert's testimony is correct; he or she must only prove by a preponderance of the evidence that the testimony is reliable. *Moore*, 151 F.3d at 276.

Defendant also argues that Dr. Bell's specific methods are unreliable, directing the Court's attention in particular to paragraphs 16-22 and 39-56. In these paragraphs, Dr. Bell discusses Defendant's SSO reporting and explains the spill identification and mapping of SSOs that he completed related to this case. In its objections, Defendant acknowledges that Dr. Bell reviewed reports on Defendant's SSOs, MS4 system maps provided by relevant municipalities, historical information about area water bodies downstream of these SSOs, and examined photographs of the locations of these SSOs. Def.'s Objections at 6:6-8, Dkt. #104. However, Dr. Bell also states that he examined maps of the storm drain systems prepared by government agencies, requested field investigation of the path of the discharges when the documentary evidence was incomplete, and did not make conclusions regarding the discharge of pollutants in SSOs when the available information was incomplete. Bell Decl. ¶¶ 39-46, Dkt. #73. For example, in paragraph 46, which refers to an SSO in Menlo Park, Dr. Bell states that the SSO path and the surface water pollutants discharged to "could not be traced with the information made available to me. I did not include this SSO in my analysis."

Upon review of the parties' arguments and the evidence presented by Dr. Bell, the Court finds that this portion of his testimony raises at least questions about the reliability of his methodology. In his declaration, Dr. Bell makes a number of assumptions based on generalized data (*e.g.* from the EPA) about rainfall and flow, but he does not make any calculations particular to the

United States District Court

For the Northern District of California

1  MS4 characteristics in *this* case.  For instance, he did not calculate the amount of SSO flowing into

2  MS4 for each SSO intake, the length of the MS4 pathway to surface waters, the slope of the MS4

3  pipes, etc., in concluding the SSO reached surface waters.

4          In addition, where there were no maps, there are serious questions about the qualifications of

5  those that conducted field investigations, as well as their methodologies, especially with respect to

6  the pathways between the MS4 intake and surface water outfall.  For example, Plaintiff states that

7  Defendant reported SSOs entering the MS4 where the location of the relevant storm drains was

8  missing from the MS4 data that Plaintiff obtained.  For these spills, Plaintiff states that its "field

9  investigation confirmed the GPS location or address of each spill and then, using GPS, identified the

10  storm drains where the SSO entered the MS4."  Pl.'s Mot. at 12:12-16.  For an explanation of the

11  field investigation, Plaintiff cites to the Declaration of Andrea Kopecky, a Legal Associate

12  employed by San Francisco Baykeeper.  Dkt. No. 75.  In her declaration, Ms. Kopecky states that

13  she used a GPS to mark the location of manholes and storm drains for each of these locations, used a

14  digital camera to take pictures of the manholes and storm drains at each site, and then, starting at the

15  manholes, identified storm drains that were likely to receive sewage in the event of a spill, based in

16  part on which direction the road was sloping, and then traced the spill from the storm drain to a

17  visible waterbody.  Kopecky Decl. ¶ 13, Dkt. No. 75.  Ms. Kopecky provides no information

18  regarding her qualifications for making these determinations.

19          The Court concludes nonetheless that for purposes of this motion, Dr. Bell's declaration

20  survives *Daubert*.  The issues discussed above go to the weight of the opinion testimony and are not

21  so fundamental as to bar its threshold admissibility.

22          In paragraphs 23-27, Dr. Bell addresses Defendant's SSO reports and states that Defendant

23  under-reports the volume of SSOs.  Defendant argues that Dr. Bell fails to offer sufficient facts to

24  support his conclusions.  However, Dr. Bell explains the principles he utilizes to demonstrate

25  estimation of spill volumes and how they can be under-reported, *see* Bell Decl. ¶¶ 23-24, Dkt. #73,

26  and provides specific examples of how he determined that Defendant's methods underestimate spill

27  volume.  Bell Decl. ¶¶ 25-27, Dkt. #73.  For instance, in paragraph 25, Dr. Bell states as follows:

28

1    The Overflow Sewer Report for SSO Number 30 on Table 2 reports a
2    call out at 6:25 AM.  The SSO stopped at 7:35 AM; 70 minutes later.
     SSO duration on the Overflow Sewer Report was recorded as 40
3    minutes.  Given the estimated SSO flow rate of 5 gallons per minute
     (gpm) for 40 minutes, West Bay estimated the SSO volume discharged
4    to be 200 gallons.  Using the correct minimum duration of the SSO, 70
     minutes, the volume of the SSO was, at least, 350 gallons; 175% of
5    West Bay's reported estimated volume.

6    *Id.* ¶ 25.  In reaching this conclusion, Dr. Bell utilized Defendant's own overflow report.  The Court

7    finds no reason to determine that this testimony is unreliable.

8         Paragraphs 28-38 offer generalized summaries of various bodies of water that Dr. Bell states

9    are surface waters that received discharges from Defendant's SSOs.  Defendant argues that his

10   conclusions regarding whether or not Defendant's SSOs reached these areas are unsubstantiated, and

11   that he provides descriptions regarding these areas without any supporting references or

12   documentation.  However, Defendant fails to provide any specific instances of statements that it

13   contends are unsubstantiated.  A review of Dr. Bell's declaration shows that he does, in fact, support

14   his conclusions with numerous documents, both historical and current, regarding the waters.  Bell

15   Decl. fn. 32-72, Dkt. No. 73.  For example, in paragraph 32, Dr. Bell states that "Corte Madera

16   Creek discharges into San Francisquito creek after passing through Searsville Lake and spilling over

17   Searsville Dam.  [Defendant's] SSOs and the pollutants contained therein reaching Corte Madera

18   Creek impact the chemical/biological integrity of Corte Madera Creek, San Francisquito Creek, and

19   San Francisco Bay."  Bell Decl. ¶ 32, Dkt. No. 73.  In support of this testimony, Dr. Bell provides a

20   United States geological survey detail report for Corte Madera Creek, the Oakland Museum's Guide

21   to San Francisco Bay Area Creeks, and a San Francisquito Creek Joint Power Authority, San

22   Francisquito Creek Watershed, July 2002 map.  Hunt Decl. Exs. J, K, Dkt. No. 88.  Defendant does

23   not object to any of the documents utilized by Dr. Bell.  And, given Dr. Bell's qualifications

24   discussed above, Defendant has failed to show how his use of this documentation is unreliable.

25   While Defendant might disagree with the conclusions Dr. Bell reached, the Court finds no reason to

26   find his testimony unreliable on this basis.

27        Finally, Defendant argues that paragraphs 57-83, which contain Dr. Bell's conclusions

28   regarding which of Defendant's SSOs reached surface waters, are objectionable because he reached

23

**United States District Court**
For the Northern District of California

1 those conclusions through an unreliable methodology.  Without providing any specific examples or

2 legal authority in support of its argument, Defendant requests that the Court disregard paragraphs

3 57-83.  However, as discussed above, Dr. Bell's declaration establishes his qualifications to make

4 these determinations, he has provided uncontested documentation supporting his testimony, and

5 Defendant provides nothing more than generalized one-line arguments regarding why his

6 methodology is unreliable.  As Dr. Bell's conclusions are based on the knowledge and experience of

7 his discipline rather than on "subjective belief or unsupported speculation," the Court finds his

8 testimony admissible.  *Daubert*, 509 U.S. at 589; *Kumho Tire Co.*, 526 U.S. at 147-48.  And, once

9 again, while Defendant might disagree with the conclusions Dr. Bell reached, Plaintiff need not

10 prove that his conclusions are correct.  *Moore*, 151 F.3d at 276.

11 　　　Based on this analysis, the Court determines that Dr. Bell's testimony is the product of

12 reliable principles and methods pursuant to FRE 702.

13 　　　　　　　　　ii.　　Whether Dr. Bell's Testimony is Relevant

14 　　　Second, the Court must determine whether Dr. Bell's opinion assists in understanding or

15 determining a fact in issue.  As stated above, the relevancy, or "fit," prong requires that the

16 testimony be "relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the

17 proposing party's case."  *Daubert II*, 43 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 597).

18 Relevancy requires opinions that would assist the trier of fact in reaching a conclusion necessary to

19 the case.  *Kennedy*, 161 F.3d at 1230.  Defendant's objections include references to FRE 402, yet it

20 fails to explain why it cites to this rule.  FRE 402 provides that all relevant evidence is admissible,

21 and evidence which is not relevant is not admissible.  Fed. R. Evid. 402.  "'Relevant evidence'

22 means evidence having any tendency to make the existence of any fact that is of consequence to the

23 determination of the action more probable or less probable than it would be without the evidence."

24 Fed. R. Evid. 401.  A review of Dr. Bell's declaration shows that his testimony meets this standard.

25 　　　Paragraphs 7-15 provide information on the constituents of sewage, both generally and

26 specifically as to the sewage conveyed by Defendant.  The composition of sewage is relevant to the

27 question of the types of pollutants discharged to waters of the United States.  Paragraphs 23-27

28 provide Dr. Bell's opinions on the accuracy of Defendant's reporting of the volume of its SSOs.

1    Given that Defendant disputes that its SSOs reached surface waters, Dr. Bell's determinations are

2    relevant.  Paragraphs 28-38 provide facts that support Dr. Bell's conclusion that Defendant's SSOs

3    reach surface waters, and his conclusion that these surface waters are waters of the United States.

4    This conclusion relates to an element of Plaintiff's case, and Dr. Bell's testimony related to this

5    issue is therefore relevant.  Paragraphs 57-83 provide facts demonstrating which surface waters

6    received discharges from Defendant's SSOs.  As Plaintiffs' summary judgment motion is focused on

7    proving that certain of Defendant's SSOs resulted in the discharge of pollutants to waters of the

8    United States, the Court finds this testimony relevant.

9         Based on this analysis, the Court finds that Dr. Bell's opinion is relevant to material aspects

10   of Plaintiff's case.  Accordingly, because Dr. Bell's testimony is both relevant and reliable under

11   *Daubert*, the Court DENIES Defendant's request that it disregard the declaration of Bruce Bell as

12   inadmissible expert witness testimony.

13                     b.     Whether the Bell Declaration is Inadmissible as Fact Witness Testimony

14        In the alternative, Defendant argues that Dr. Bell's declaration is also unavailable as fact

15   witness testimony because he was not formally identified as a fact witness until February 11, 2011,

16   (Thorme Decl. ¶¶ 14-16, Ex. C, Dkt. No. 98), over two weeks after Plaintiff filed its motion for

17   partial summary judgment.  Defendant argues that  his declaration must therefore be excluded

18   pursuant to FRCP 37(c)(1).  Defendant also maintains that Dr. Bell's declaration is replete with

19   unsupported conclusions and lacking personal knowledge, and should be disallowed on these

20   grounds as well.

21        In response, Plaintiff argues that Dr. Bell is its expert witness and it properly disclosed him

22   as its expert when it filed its motion for partial summary judgment on January 31, 2011.  Thus,

23   Plaintiff argues that Dr. Bell is a properly disclosed expert whose personal knowledge is irrelevant

24   to the admissibility of his expert declaration.

25        As discussed above, the Court finds that Dr. Bell's declaration is properly admitted as expert

26   witness testimony; therefore, his testimony is not that of a fact witness.  Pursuant to FRCP 26, a

27   party must make its expert witness disclosures at the times and in the sequence that the court orders.

28   Fed. R. Civ. P. 26(a)(2)(D).  Here, the Court ordered that experts be disclosed and reports provided

by April 29, 2011.  Case Mgmnt. Order ¶ 2(c), Dkt. No. 36.  Thus, Plaintiff's disclosure is timely under the Court's case management order.  Furthermore, as noted above, Defendant could have moved under Rule 56(d) to defer its opposition and take Dr. Bell's deposition.  Defendant failed to do so.  Thus, Plaintiff properly disclosed Dr. Bell under FRCP 26 and the Court's case management order.  Defendant's argument is without merit.

       4.    <u>Hearsay Objections</u>

Finally, Defendant objects on hearsay grounds to two exhibits submitted by Plaintiff in support of its motion.  Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  FRE 802 prohibits the admission of hearsay statements, subject to certain exceptions.  The Court shall discuss each objection in turn.

       a.    <u>Hunt Declaration</u>

Defendant objects to Exhibit A to the Declaration of Drevet Hunt, which is a table listing Defendants' 68 SSOs that allegedly reached surface waters.  Dkt. No. 83.  The table has columns containing an identifying number for each specific SSO, as well as each SSO's location, date, and reported volume in gallons, and a column for the name of related surface waters.  Hunt Decl. Ex. A, Dkt. No. 83.  Defendant argues that this document is an out-of-court statement offered to prove the truth of the matter asserted – that the listed SSOs actually reached surface waters.

In response, Plaintiff argues that the spill table is not offered as evidence but is instead provided for the Court's reference under FRE 1006 as an index of the SSOs at issue in this Motion.  Plaintiff explains that the table lists each spill by number and thus refers to the numbered exhibits that are part of Exhibit D to the Hunt declaration.  Exhibit D consists of  copies of documents obtained by Plaintiff from Defendant either via Mr. Hunt's Public Records Act document request sent to Defendant on June 29, 2009, or Plaintiff's Requests for Production of Documents, Sets 1-3.  Hunt Decl. ¶ 9, Dkt. #83.

Pursuant to FRE 1006, "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  "When considering the admissibility of exhibits of this nature, it is critical to

United States District Court

For the Northern District of California

1  distinguish between charts or summaries as evidence and charts or summaries as pedagogical

2  devices." *United States v. Wood*, 943 F.2d 1048, 1053 (9th Cir. 1991) (citation omitted).  Charts and

3  summaries as evidence are governed by FRE 1006.  In contrast, charts or summaries of testimony or

4  documents already admitted into evidence are merely pedagogical devices, and are not evidence

5  themselves. *Id.* (citation omitted).  "[S]uch pedagogical devices should be used only as a testimonial

6  aid, and should not be admitted into evidence."  *Id.* (citations omitted).

7         Here, Plaintiff's spill table is a summary of the documents contained in Mr. Hunt's

8  declaration; thus, as it is based on evidence submitted by Plaintiff in support of its motion, the Court

9  shall construe the table as merely a pedagogical device from which no part of Plaintiff's case may be

10 established.  For instance, the table contains a column titled "Name of Surface Water," implying that

11 each SSO reached the surface water listed in that column.  The Court will not consider such

12 evidence to the extent it asserts the truth of the matter asserted in that column.  Further, Plaintiff

13 states that it obtained the underlying documents from Defendant, and that the table is based on

14 Defendant's own reports.  As Defendant objected to the table and not the underlying documents, the

15 Court has no reason to find that the underlying documents are inadmissible.  Accordingly, the Court

16 finds no reason to strike the spill chart, and will consider it as a summary and not evidence and thus

17 DENIES Defendant's request to disregard Exhibit A to Mr. Hunt's declaration.

18              b.      Lucke Declaration

19        Defendant also objects to Exhibit A, page 84, to the Declaration of Justin Lucke.  Dkt. No.

20 81.  This document is a "Contact Report," dated November 3, 1977, from the State Water Resources

21 Control Board, Division of Water Rights, prepared by Division Personnel PJ Conroy.  The

22 handwritten report refers to a "New Appl. in San Mateo Co." and shows that PJ Conroy contacted

23 "Clifford Chernick, attorney for applicants" and "Town of Atherton City Hall" by telephone.  Lucke

24 Decl. Ex. A, p.84, Dkt. No. 81.  Based on the phone conversations, PJ Conroy provided the

25 following "Conversation Description": "(1) Mr. Chernick confirmed location of point of diversion

26 on unnamed stream or creek just south of Walsh Rd.  He stated that this stream is locally known as

27 the Atherton Channel.  (2) City Hall stated that the Atherton Channel empties into San Francisco

28 Bay."  *Id.*  At the bottom of the report, under a "Decision" heading, PJ Conroy wrote: "Make above

United States District Court

For the Northern District of California

1  change on appl. & code accordingly." *Id.*  Under the "Action Items" heading, PJ Conroy wrote:

2  "Accept appl." *Id.*  Defendant argues that the report discusses out-of-court statements made by non-

3  party individuals and offered to prove the truth of the matter asserted – that Atherton Channel

4  empties into San Francisco Bay.

5         In response, Plaintiff states that it obtained the document as part of a request for documents it

6  sent to the California State Water Resources Control Board ("SWRCB"), pursuant to the California

7  Public Records Act, Cal. Gov't Code § 6250 *et seq.*  Lucke Decl. ¶ 4, Dkt. No. 81.  Thus, Plaintiff

8  contends that the document is a public record and is therefore admissible under the public records

9  and reports hearsay exception.

10         Pursuant to FRE 803(8), records, in any form, of public offices or agencies, setting forth

11  "factual findings resulting from an investigation made pursuant to authority granted by law," are not

12  excluded by the hearsay rule, "unless the sources of information or other circumstances indicate lack

13  of trustworthiness." Fed. R. Evid. 803(8).  "Justification for the exception is the assumption that a

14  public official will perform his duty properly and the unlikelihood that he will remember details

15  independently of the record." Fed. R. Evid. 803(8) advisory committee's note.  A plaintiff "must

16  show that the factual findings resulted from an investigation made pursuant to authority granted by

17  law.  If [the plaintiff] meets this burden, the factual findings will be presumed to be sufficiently

18  trustworthy to overcome the hearsay bar unless [the defendant] . . . establishes that the sources of

19  information or other circumstances indicate lack of trustworthiness." *Gibson v. Cnty. of Riverside*,

20  181 F. Supp. 2d 1057, 1070 (C.D. Cal. 2002) (citing *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir.

21  1988).

22         Here, to establish that the factual findings resulted from authority granted by law, Plaintiff

23  directs the Court's attention to California Water Code section 1275.  This section, which addresses

24  applications to appropriate water, provides as follows: "After an application has been perfected, the

25  board may request additional information reasonably necessary to clarify, amplify, correct, or

26  otherwise supplement the information required to be submitted."  Cal. Water Code § 1275.  Plaintiff

27  states that the Contact Report indicates that PJ Conroy was confirming that the water source was

28  Atherton Channel and that Atherton Channel empties into San Francisco Bay.  Thus, Plaintiff

United States District Court
For the Northern District of California

argues, a SWRCB official was making the required factual findings – that Atherton Channel empties into San Francisco Bay – resulting from an investigation made pursuant to authority granted by law – California Water Code section 1275. FRE 803(8) "is designed to allow admission of official records and reports prepared by an agency or government office for purposes independent of specific litigation." *United States v. Stone*, 604 F.2d 922, 925 (5th Cir. 1979). The rule calls for "[a] broad approach to admissibility" that "assumes admissibility in the first instance," *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167, 169 (1988). Based on this authority, the Court finds that Plaintiff has shown that the factual findings resulted from an investigation made pursuant to authority granted by law, and that the investigation was made for purposes independent of specific litigation. *See also* Fed. R. Evid. 803(8) advisory committee's note (Rule 803 (8)(c) "assumes admissibility [of 803(8)(c) reports] in the first instance but with ample provision for escape if sufficient negative factors [regarding trustworthiness] are present.").

As Plaintiff has met its minimal burden, Defendant must establish that the sources of information or other circumstances indicate lack of trustworthiness. In its objections, Defendant does not establish a lack of trustworthiness; instead, it merely states that the document is hearsay to which no exception applies because it contains multiple levels of hearsay – the report is an out-of-court statement made by PJ Conroy that discusses out-of-court statements made by non-party individuals. Despite Defendant's anemic showing, the Court finds that the report warrants closer scrutiny. The advisory committee proposed a nonexclusive list of four factors which are helpful in determining trustworthiness: "(1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which [it was] conducted, and (4) possible motivation problems." Fed. R. Evid. 803(8) advisory committee's note.

Here, the Court is concerned that it knows nothing about PJ Conroy's level of skill or experience. More importantly, even if the Court were to find PJ Conroy's statements trustworthy (and, at this juncture, it has no reason not to), more troubling is the fact that the report repeats statements from an attorney and an unnamed individual, and there is no indication that those individuals were under an official duty to report the matters addressed in their statements. Rule 803(8) deems a public report admissible based on the notion that its official author knows what he is

talking about and will state the facts accurately.  That presumption does not attach to the statements

of third parties who themselves bear no public duty to report what they observe.  Thus, the

statements in the report would be hearsay even if the author of the report were present in court.

*United States v. Chu Kong Yin*, 935 F.2d 990, 999 (9th Cir. 1991) ("the public documents exception

to the hearsay rule is only the substitute for the appearance of the public official who made the

record"); *see also United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) ("It is well established

that entries in a police report which result from the officer's own observations and knowledge may

be admitted but that statements made by third persons under no business duty to report may not.").

Further, no type of formal investigative hearing was held; the report indicates that the SWRCB

employee simply called two people.

Accordingly, the Court finds that the report is not admissible under the public records

hearsay exception because it contains hearsay-within-hearsay.  Therefore, the Court SUSTAINS

Defendant's objection to page 84 of Exhibit A to the Lucke declaration.

5.     Conclusion

Based on the analysis above, the Court OVERRULES Defendant's objections to the

declarations of fact witnesses Anna Fairbank, Terry Blanchard, Dudley Kenworthy, and Andrea

Kopecky; OVERRULES Defendant's objection to the corrected declaration of Deborah Self;

OVERRULES Defendant's objection to the declaration of expert witness Bruce Bell; OVERRULES

Defendant's objection to Exhibit A to Mr. Hunt's declaration; and SUSTAINS Defendant's

objection to page 84 of Exhibit A to the Lucke declaration.

C.     Threshold Issues:  Standing and Notice

The Ninth Circuit has held that the "CWA's citizen suit provision extends standing to the

outer boundaries set by the 'case or controversy' requirement of Article III of the Constitution."

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).  Thus, the first

consideration is whether Plaintiff has standing under Article III.  *Id.*  To bring this action in federal

court, Plaintiff has the burden of showing that: "(1) it has suffered an "injury in fact" that is (a)

concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury

is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. TOC, Inc.*, 528 U.S. 167, 180-81 (2000). "The relevant showing for purposes of Article III standing is not injury to the environment but injury to the plaintiff." *Id.* at 181.

As a membership organization, Plaintiff has standing to bring suit on behalf of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth*, 528 U.S. at 181 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). In its motion, Plaintiff maintains that it has standing because at least four of its members – Terry Blanchard, Dudley Kenworthy, Robert Fairbank, and Anna Fairbank ("Baykeeper Members") – have standing to bring the action independently. Pl.'s Mot. for Partial Summ. J. 7, Dkt. No.71.

In response, Defendant maintains that Plaintiff has failed its burden to prove standing to bring this action.

1.    Whether the Baykeeper Members Have Suffered an Injury in Fact

To establish standing, Plaintiff must first show that its members have suffered an injury in fact. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth*, 528 U.S. at 182 (internal quotations and citations omitted).

Here, in support of its motion, Plaintiff submitted declarations of the Baykeeper Members in which they attest that they have suffered an injury in fact because they heavily use the waters of the San Francisco Bay and its tributaries for aesthetic and recreational enjoyment, and that their use and enjoyment is harmed because the Bay is impaired by pollution, which they believe is caused in part by Defendant's SSOs. Self Decl. ¶¶ 22-24, Dkt. No. 96; R. Fairbank Decl. ¶¶ 4-10, Dkt. No. 79; A. Fairbank Decl. ¶¶ 4-8, Dkt. No. 78; Blanchard Decl. ¶¶ 4-10, Dkt. No. 77; Kenworthy Decl. ¶¶ 4, 6-7, Dkt. No. 80.

In its opposition, Defendant responds that Plaintiff failed to disclose three of its declarants – Terry Blanchard, Anna Fairbank, and Dudley Kenworthy – as witnesses through initial or

31

United States District Court

For the Northern District of California

1    supplemental disclosures.  Thus, Defendant argues that FRCP 37(c)(1) prohibits the use of these

2    three witnesses' declarations.  However, as discussed above, the Court finds that Plaintiff's failure to

3    disclose these three witnesses prior to filing its motion was substantially justified and harmless.  *See*

4    Section III(B)(1), *supra*.

5         Next, Defendant argues that Plaintiff has failed to meet its burden of proving an injury in fact

6    because, rather than identifying the specific creeks and tributaries that the Baykeeper Members

7    claim to use, they only vaguely assert that they use the "sloughs of South San Francisco Bay," the

8    "Bay," or "Bay Waters."  In its Reply brief, Plaintiff argues that it is not necessary for the Baykeeper

9    Members to identify the precise section of waters allegedly receiving SSOs.

10        Upon review of the Baykeeper Members' declarations, the Court finds that the locations

11   provided are more specific than Defendant contends: "I did a lot of kayaking and canoeing on

12   Alviso Slough and around the Don Edwards Wildlife Recreation Area," Blanchard Decl. ¶ 4, Dkt.

13   No. 77; "I travel to many parts of the Bay on my boat for my own personal recreation, south from

14   the Dumbarton Railroad Bridge to north past San Francisco," *Id.* ¶ 5; "I still occasionally go out on

15   my canoe or kayak, which I usually launch from the Port of Redwood City," *Id.* ¶ 6; "I went fishing .

16   . . west of the Berkeley Pier from my sailboat," R. Fairbank Decl. ¶ 7, Dkt No. 79; "I frequently

17   participate in sailing races in the area between the Bay Bridge and Hunters Point," *Id.* ¶ 8; "I started

18   biking along the Bay Trial from Millbrae down to Redwood Shores," A. Fairbank Decl. ¶ 7, Dkt.

19   No. 78; "I have visited Alviso Slough, Mallard Slough and Coyote Creek, Newark Slough, and

20   Ravenswood Regional Open Space within San Francisco Bay . . . to enjoy the tidal wetlands and

21   observe shorebirds and water birds," Self Decl. ¶ 22, Dkt. No. 96; "I used to recreate directly on the

22   water by windsurfing near Foster City and sailing in the Redwood City and Palo Alto harbor areas,"

23   Kenworthy Decl. ¶ 7, Dkt. No. 80.  These are all more specific than Defendant suggests when it

24   argues that the Baykeeper Members vaguely assert that they use the "sloughs of South San Francisco

25   Bay," the "Bay," or "Bay Waters."

26        Further, the United States Supreme Court has found sufficient injury where the plaintiff's

27   declarations were not as precise as Defendant would like to require.  In *Friends of the Earth*, the

28   Supreme Court looked to affidavits in which members provided geographic identifiers such as that

they "lived a half-mile from [the defendant's] facility," used "the river between 3 and 15 miles downstream from the facility," "lived two miles from the facility," "lived one-quarter mile from [the defendant's] facility," and one member that "had canoed approximately 40 miles downstream of the [defendant's] facility." *Friends of the Earth*, 528 U.S. at 181-83. The Court found that the plaintiff had demonstrated sufficient injury to establish standing because its members averred in affidavits that they used the river near the defendant's facility, but had stopped using it because they were concerned that the water was polluted with discharges. *Friends of the Earth*, 528 U.S. at 181-82.

In contrast, the Supreme Court in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), addressed an environmental organization's allegations that the Bureau of Land Management's "land withdrawal review program," a program covering millions of acres, illegally opened up public lands to mining activities. The Court held that the plaintiff could not survive a summary judgment motion merely by offering "averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action." *Lujan*, 497 U.S. at 889.

Here, the Court finds that the Baykeeper Members' declarations more closely resemble those of the affiants in *Friends of the Earth*. In fact, there is no indication that the Baykeeper Members' descriptions are more than 15 miles from specific creeks and tributaries, let alone 40 miles. Rather than a case in which a plaintiff presents mere general averments and conclusory allegations like those found inadequate in *Lujan*, Plaintiff here has provided declarations related to specific geographical areas.

Moreover, each of the Baykeepers Members declarations provide specific evidence regarding their use of the areas that Plaintiff contends are affected by Defendant's alleged discharges. In his declaration, Robert Fairbank attests that his use of San Francisco Bay waters began after he moved to the Bay Area in 1978, including sailing on Bay waters and walking and biking along the water's edge on the Peninsula. Fairbank Decl. ¶ 4, Dkt. No. 79. Mr. Fairbank states that through his work as a member of San Francisco Baykeeper, he is aware that sewage spill discharges to the Bay threaten the species that live in there, and he is particularly concerned about the frequency and volume of sewage spills on the San Francisco Peninsula. *Id.* ¶ 6. Mr. Fairbank states that he also

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

suffers harm because he enjoys fishing on the Bay and eating what he catches, but he recently learned from media accounts and his work with Plaintiff that contaminated discharges into the Bay, including raw sewage, make it unsafe to eat fish out of the Bay.  Thus, he has not fished there since May 2008 when he learned about the extent of contamination, and he is unlikely to fish in the Bay's waters until the fish become safe to eat.  *Id.* ¶ 7.  Mr. Fairbank also states that he has been sailing on the San Francisco Bay since 1978 and currently sail about four times a month on the Bay.  During his sails, Mr. Fairbank states that he sees evidence of pollution and unnatural substances in the Bay.  Seeing indications that the Bay's ecosystem is degraded makes for a much less pleasant sailing experience and harms his aesthetic and recreational interest in sailing on the San Francisco Bay.  *Id.* ¶ 8.

Terry Blanchard attests that he and his wife are civilian volunteers with the U.S. Coast Guard Auxiliary, and that he goes out on patrols in one of his power boats on behalf of the Coast Guard about once a week.  Blanchard Decl. ¶ 5, Dkt. No. 77.  He states that he travels all around the Bay as part of these patrols, and also goes out on boat rides with my wife for their own enjoyment, usually once a week, traveling many parts of the Bay for personal recreation, south from the Dumbarton Railroad Bridge to north past San Francisco.  *Id.*  On March 26, 2007, he was on patrol for U.S. Coast Guard and came to the assistance of power boat.  *Id.* ¶ 7.  In the process, the palm of his left hand was slit open by the bottom of the anchor of the other boat.  *Id.*  Once onshore, he was taken to the Kaiser Emergency Room in Redwood City where, in the course of getting treatment for the injury, he was told by medical professionals, including two ER doctors and an orthopaedic surgeon, that he was at risk for an infection due to the Bay's poor water quality.  *Id.*  He received both tetanus and wide-range antibiotics shots and was prescribed additional antibiotics to insure that he would not get an infection.  *Id.*  Since this incident, Mr. Blanchard states that has became even more concerned about the water quality of San Francisco Bay and that, while boating, he now wear gloves when working on deck because he worries that he could get a cut that would become infected.  *Id.* ¶ 8.  Mr. Blanchard also states that he worries about bacteria in the water and tries not to inhale or ingest the water spray to avoid getting sick.  *Id.*  He is also concerned about coming into contact

1   with pathogens in the Bay sediments like when cleaning his boat, and therefore makes sure to wash

2   thoroughly after being exposed to Bay water or mud due to these concerns.  *Id.*

3       Anna Fairbank attests that she began to recreate on San Francisco Bay in 1979, when she

4   first learned to sail, and that she still sails frequently on the Bay with my husband, family, and

5   friends.  Fairbank Decl. ¶ 4, Dkt. No. 78.  She owns a sailboat with her husband and spends a fair

6   amount of time on or near San Francisco Bay either sailing, doing maintenance work on the boat, or

7   at the South Beach Yacht Club.  *Id.*  She states that she has seen evidence of pollution and unnatural

8   substances in the Bay, and knowing that the Bay's ecosystem is degraded by sewage spills and other

9   pollutants makes for a much less enjoyable experience.  *Id.*  Ms. Fairbank states that she has learned

10  from media accounts and her involvement as a member of Baykeeper that contaminated discharges

11  into the Bay, including raw sewage, and that eating fish from the Bay could be a health hazard.  *Id.* ¶

12  6.  Her family eats a lot of fish, but she is very wary of buying any fish that was caught in the Bay

13  since she believes it is unsafe.  *Id.*  Ms. Fairbank states that she occasionally walks and bikes along

14  the Bay Trail from Millbrae down to Redwood Shores, but the sewage pollution problem threatening

15  Bay waters impacts her aesthetic interests and enjoyment of the shoreline areas.  *Id.* ¶ 7.

16  Additionally, because she is aware of the sewage problems and poor water quality in that area, she

17  prevents her dog from entering the Bay waters.  *Id.*

18      Dudley Kenworthy attests that his ability to use and enjoy San Francisco Bay, its tributaries

19  and the surrounding areas for recreation and enjoyment has been harmed because he is aware that

20  these areas are ecologically degraded.  Kenworthy Decl. ¶ 7, Dkt. No. 80.  Specifically, he used to

21  recreate directly on the water by windsurfing near Foster City and sailing in the Redwood City and

22  Palo Alto harbor areas, but now most of his recreational activities involve walking and riding his

23  bicycle along creeks and the Bay shoreline.  *Id.*  He walks or ride his bicycle along San Francisquito

24  Creek and Arastradero Creek, a tributary to Los Trancos Creek.  *Id.*

25      Deborah Self attests that she has visited Alviso Slough, Mallard Slough and Coyote Creek,

26  Newark Slough, and Ravenswood Regional Open Space within San Francisco Bay to enjoy the tidal

27  wetlands and observe shorebirds and water birds.  Self Decl. ¶ 22, Dkt. No. 96.  Ms. Self is a

28  kayaker and has been learning about tides so she can enjoy paddling the sloughs in South San

1    Francisco Bay. *Id.* ¶ 24. She states that knowing about the sewage contamination is a serious

2    emotional hurdle to get over, and she definitely would not kayak anywhere near Defendant's

3    Collection System following a rain event because of fear of bacterial infections. *Id.* She is afraid

4    that she will be unable to use the waters in South San Francisco Bay for kayaking enjoyment without

5    running the risk of getting sick due to exposure to raw sewage, and she finds repulsive the thought

6    that she might pass through sewage-contaminated water. *Id.* ¶ 30.

7       Thus, because the Baykeeper Members aver that they use the San Francisco Bay and its

8    tributaries including areas proximate to the alleged SSOs, and are persons for whom the aesthetic

9    and recreational values of the area are lessened by the challenged activity, and because Defendant

10    has failed to raise any genuine dispute with respect to this showing, the Court finds that Plaintiff has

11    adequately established that it has suffered an injury in fact that is concrete and particularized and

12    actual or imminent.

13       2.    <u>Whether the Injury is Fairly Traceable to the Challenged Action of Defendant</u>

14       Next, Plaintiff must show that the injuries to its members are fairly traceable to Defendant's

15    discharges. "The issue in the causation inquiry is whether the alleged injury can be traced to the

16    defendant's challenged conduct, rather than to that of some other actor not before the court."

17    *Ecological Rights Found.*, 230 F.3d at 1151, 1152 (citations omitted). However, "to prove an injury

18    is fairly traceable, 'rather than pinpointing the origins of particular molecules, a plaintiff must

19    merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries

20    alleged in the specific geographic area of concern.'" *Natural Res. Defense Council v. Sw. Marine,*

21    *Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (quoting *Friends of the Earth, Inc. v. Gaston Copper*

22    *Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). "Thus, the causal connection put forward for

23    standing purposes cannot be too speculative, or rely on conjecture about the behavior of other

24    parties, but need not be so airtight at this stage of the litigation as to demonstrate that the plaintiffs

25    would succeed on the merits." *Pac. Lumber Co.,* 230 F.3d at 1152 (citing *Pub. Interest Research*

26    *Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir. 1990). In

27    *Pacific Lumber Co.*, the plaintiffs brought suit pursuant to the CWA's citizen suit provision,

28    claiming violations of a NPDES permit. *Id.* at 1145. The plaintiffs claimed that their enjoyment of

1   various activities on the relevant waterways downstream from the defendant's facilities were

2   lessened due to the defendant's alleged violations of various provisions of the CWA.  *Id.*  The court

3   concluded that this was enough to satisfy the causation element of Article III standing.  *Id.* at 1152-

4   53.  *Cf. Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (internal

5   citations and quotations omitted) ("The plaintiff must establish that the defendant's challenged

6   actions, and not the actions of some third party, caused the plaintiff's injury. . . .  This causal

7   connection need not be as close as the proximate causation needed to succeed on the merits of a tort

8   claim. . . .  Rather, an indirect causal relationship will suffice . . . so long as there is a fairly traceable

9   connection between the alleged injury in fact and the alleged conduct of the defendant).

10          As in *Pacific Lumber*, Plaintiff's standing witnesses claim that their use and enjoyment of the

11   Bay and its tributaries is lessened due to Defendant's alleged violations of the CWA.  The areas they

12   use are downstream from Defendant's SSOs.  Under *Pacific Lumber*, this is enough to establish

13   causation.

14          To be sure, in *Pacific Lumber*, there was no indication of intervening pollution caused by

15   third parties.  Here, Defendant argues that Plaintiff has failed to demonstrate that its alleged injuries

16   were caused by Defendant's SSOs and not some other entity.  Defendant's attempt to break the

17   chain of causation by blaming other polluters is not sufficient for summary judgment purposes.

18   "[T]he threshold requirement of traceability does not mean that plaintiffs must show to a scientific

19   certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs in order to

20   establish standing."  *Sw. Marine*, 236 F.3d at 995 (internal citations and quotations omitted).  To

21   satisfy this requirement, "rather than pinpointing the origins of particular molecules, a plaintiff must

22   merely show that a defendant discharges a pollutant that causes or *contributes* to the kinds of

23   injuries alleged in the specific geographic area of concern."  *Id.* (internal citations and quotations

24   omitted) (emphasis added).  Where more than one potential discharger is part of the same system, a

25   plaintiff need not show that the discharge came from a specific user.  *Cmty. Ass'n for Restoration of*

26   *the Env't v. Henry Bosma Dairy*, 65 F. Supp. 2d 1129, 1141 (E.D. Wash. 1999) (citing *Pub. Interest*

27   *Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir.

28

1   1990)).  Plaintiff has submitted substantial evidence that Defendant's SSOs have "contributed" to

2   the injuries suffered.

3          Defendant cites no authority that Plaintiff lacks standing under the CWA if third parties are

4   also causing pollution.  The argument, carried to its logical extent, would mean that where there are

5   many polluters, none could be held liable.  Thus, for purposes of standing, the Court finds that

6   Plaintiff has established that the injury is fairly traceable to the challenged action of Defendant.

7          3.        Whether it is Likely that Plaintiff's Injury Will be Redressed by a Favorable Decision

8          Finally, Plaintiff must show that it is likely, rather than merely speculative, that the injury

9   will be redressed by a favorable decision.  Here, Plaintiff seeks injunctive relief to halt Defendant's

10  alleged continuing violations of the CWA, and civil penalties for alleged violations occurring since

11  January 12, 2009.  Compl., Dkt. No. 1.  The Court shall consider each in turn.

12             a.        Injunctive Relief

13         Plaintiff seeks to enjoin Defendant "from discharging SSOs to waters of the United States

14  without a NPDES permit, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. §

15  1311(a)."  Compl. ¶ 123(b), Dkt. No. 1.  "A plaintiff who seeks injunctive relief satisfies the

16  requirement of redressability by alleging a continuing violation . . . of an applicable statute or

17  standard."  *Sw. Marine*, 236 F.3d at 995.  Here, Plaintiff alleges that Defendant has and continues to

18  discharge sewage and its associated pollutants to waters used by Plaintiff's members.  Bell Decl., ¶¶

19  28-29, Dkt. No. 73.  Therefore, it would appear that an injunction prohibiting the alleged discharges

20  would redress Plaintiff's members' injuries.

21         Defendant argues that injunctive relief is not appropriate in this case for several reasons.

22  First, it argues that an injunction would require coverage by a NPDES permit, which is problematic

23  because the issuance of such a permit depends upon the discretionary action of an independent third

24  party, either the Regional Board or the EPA.  Defendant further argues that because of its status as a

25  satellite system, it could not obtain a NPDES permit authorizing it to discharge sewage from its

26

27

28

38

United States District Court

For the Northern District of California

1   Collection System.[5]  But Plaintiff does not seek an injunction requiring that Defendant obtain a

2   NPDES permit to permit the spills to continue; it seeks an order abating unpermitted SSOs.

3        Second, Defendant argues that, as a result of permit and regulatory requirements since 2007,

4   it has seen a steady decline in the total number of SSOs, increased recovery of SSOs, and several

5   years of substantially reduced SSO volumes.  Simonetti Decl. ¶¶ 2-4, Exs. A-1, A-2, Dkt. No. 100.

6   Defendant further argues that an injunction would not completely alleviate Plaintiff's concerns about

7   SSOs reaching the Bay because discharges would continue from other SSO dischargers.  As noted

8   above,  Plaintiff need not establish that Defendant is solely responsible for the pollutant at issue;

9   rather, Plaintiff must merely show that Defendant discharges a pollutant that causes or contributes to

10  the kinds of injuries alleged in the specific geographic area of concern.  *See* Section III(C)(2), *supra*.

11  Moreover, Defendant does not argue SSOs discharges has stopped, and Plaintiff contends that

12  Defendant continues to violate the CWA.  Plaintiff thus seeks an injunction to end Defendant's

13  alleged discharges.  Accordingly, Defendant's argument is without merit; and the Court finds that

14  Plaintiff's requested injunctive relief satisfies the redressability requirement.

15        b.        Civil Penalties

16       Plaintiff also requests that the Court assess civil penalties against Defendant "of up to

17  $32,500 per day per violation for all Clean Water Act violations occurring between September 28,

18  2004 and January 12, 2009, and up to $37,500 per day per violation for all Clean Water Act

19  violations occurring since January 12, 2009."  Compl. ¶ 123(c), Dkt. No. 1.  Civil penalties are

20  authorized under the CWA pursuant to 33 U.S.C. § 1319(d).  However, Defendant argues that civil

21  penalties are only authorized under the CWA for "ongoing and continuous" violations, and that

22  individual SSOs cannot be considered ongoing and continuous.  For example, Defendant points out

23  that, in the five-year plus time frame for this case, Plaintiff alleges only one discharge to West Point

24  Slough, one discharge to Redwood Creek, and one discharge to Bovet Creek.  Defendant contends

25

26  _____

27       [5] As stated above, since SBSA operates the treatment plant, Plaintiff argues that Defendant
    does not have a NPDES Permit authorizing sewage discharge.  Compl. Ex. A n.1, Dkt. No. 1; Pl.'s
    Req. for Judicial Notice ("Pl.'s RJN") Ex. O, Dkt. No. 82.  This issue is discussed below.  *See*
28  Section III(D)(3), *infra*.

1  that, by definition, each of these single discharges from different parts of the sewer system does not

2  constitute an ongoing and continuous discharge.

3        In support of its argument, Defendant cites to *Gwaltney of Smithfield, Ltd. v. Chesapeake*

4  *Bay Found.*, 484 U.S. 49 (1987).  Pursuant to *Gwaltney*, citizens may seek civil penalties only in a

5  suit brought to enjoin or otherwise abate an ongoing violation: "the harm sought to be addressed by

6  the citizen suit lies in the present or the future, not in the past."  *Id.* at 59.  However, this standard

7  has no bearing on the present case, where Plaintiff alleges continuous violations.  First, while

8  *Gwaltney* stressed the prospective nature of citizen suits, that prospective nature was stressed only as

9  a limitation on the jurisdictional basis of those suits.  "When a citizen suit is properly commenced, . .

10  . *Gwaltney* does not limit the relief which § 1319(d) affords the citizen group to only present and

11  prospective penalties."  *Atl. States Legal Found. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1136 (11th

12  Cir. 1990).  Penalties are proper for past violations as well as present and future violations.  Second,

13  Defendant attempts to impose the *Gwaltney* standard for entitlement to injunctive relief on a spill-

14  by-spill basis, rather than for the system-wide violations from Defendant's Collection System that

15  Plaintiff alleges.  Specifically, Defendant argues that Plaintiff has failed to demonstrate that each of

16  these alleged point source discharges are "ongoing and continuous" and not "wholly past."  Def.'s

17  Opp'n at 10:3-4, Dkt. No. 97.  Defendant points out that, in the five-year plus time frame for this

18  case, Plaintiff alleges only one discharge to West Point Slough, one discharge to Redwood Creek,

19  and one discharge to Bovet Creek.  Defendant contends that, by definition, each of these single

20  discharges from different parts of the sewer system does not constitute an ongoing and continuous

21  discharge warranting injunctive relief.  *Id.* at 10:5-11.  However, Defendant provides no citation in

22  *Gwaltney*, and the Court is aware of none, that prevents the Court from addressing systemwide

23  relief.  Defendant's argument ignores the point of Plaintiff's lawsuit - it is the Collection System

24  itself and not each individual spill that is at issue.  Where the SSOs area alleged to be manifestations

25  of a systemic pattern or practice, entitlement to injunctive relief likewise should be judged on a

26  systemic basis.  *See Sw. Marine*, 236 F.3d at 995 (finding that the plaintiffs satisfied the requirement

27  of redressability where the plaintiffs alleged that the defendant was continuing to violate its permits

28  and they sought an injunction to halt those continuing violations).

**United States District Court**
For the Northern District of California

1    Based on this analysis, the Court finds that it is likely that Plaintiff's injury will be redressed

2  by a favorable decision.

3        4.    Whether Plaintiff has Standing as an Organization

4    Based on the analysis above, the Court finds that Plaintiff has met its burden of showing that

5  its members have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or

6  imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

7  of Defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

8  by a favorable decision.  As a membership organization, Plaintiff has standing to bring suit on behalf

9  of its members when "its members would otherwise have standing to sue in their own right, the

10  interests at stake are germane to the organization's purpose, and neither the claim asserted nor the

11  relief requested requires the participation of individual members in the lawsuit." *Friends of the*

12  *Earth*, 528 U.S. at 181.  As Plaintiff has established that its members would have standing to sue in

13  their own right, the Court need only determine whether the interests at stake are germane to

14  Plaintiff's purpose, and whether the claim asserted or the relief requested requires the participation

15  of individual members in the lawsuit.

16    Plaintiff is a nonprofit corporation dedicated to protecting and enhancing the water quality of

17  the San Francisco Bay-Delta Estuary and its tributaries for the benefit of its ecosystems and the

18  surrounding communities.  Self Decl. ¶¶ 2, 4, Dkt. No. 96.  In its Complaint, Plaintiff seeks a

19  judgment declaring that Defendant has discharged pollutants from its Collection System into the San

20  Francisco Bay and its tributaries without a permit, in violation of the CWA, and an injunction

21  preventing Defendant from discharging pollutants without a NPDES permit.  Compl. ¶ 123, Dkt. No.

22  1.  As Plaintiff's purpose is protecting the water quality of the San Francisco Bay and its tributaries,

23  the interests in this suit are germane to the organization's purpose.

24    As to whether Plaintiff's claim requires the participation of individual members in this

25  lawsuit, the Court finds no reason to require individual members here.  First, Defendant does not

26  challenge Plaintiff's standing to bring suit on behalf of its members.  Second, even if Defendant did

27  challenge Plaintiff's standing as an organization, there is no indication that the relief Plaintiff seeks

28  – declaratory judgment and an injunction – is the type of relief that requires individual members'

United States District Court

For the Northern District of California

1   participation.  Where, as here, associational plaintiffs do not seek individualized relief for their

2   members that would require individualized proof, the participation of individual members is not

3   required. *Hunt*, 432 U.S. at 343-44; *see also Natural Res. Defense Council, Inc. v. Cnty. of Los*

4   *Angeles*, 2010 WL 761287, *5 (C.D. Cal. 2010).

5          Based on this analysis, the Court finds that Plaintiff has standing to bring suit on behalf of its

6   members as a membership organization.

7          5.     <u>Whether Plaintiff Provided Adequate Notice</u>

8          Finally, Defendant argues that Plaintiff failed to provide notice of all the alleged spills

9   addressed in its motion.  Before an action is commenced under the CWA, the citizen must give a

10  60-day notice of intent to sue.  33 U.S.C. § 1365(b)(1)(A).  When a party does not fulfill this

11  threshold requirement, "the district court must dismiss the action as barred by the terms of the

12  statute." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 33 (1989).  Pursuant to the requirements

13  adopted by the EPA, notice of the alleged violation must include sufficient information to permit the

14  recipient to identify the standard or order alleged to have been violated, the activity alleged to

15  constitute a violation, the person or persons responsible, the location, the date or dates, and contact

16  information for the person giving notice.  40 C.F.R. § 135.3(a).

17         Here, Defendant argues that Plaintiff's motion includes nine spills that were not included in

18  the notice of intent to sue letter, and no supplemental notice letter was provided.  Thus, Defendant

19  requests that the Court dismiss Spills 60-68 for lack of adequate notice.  In response, Plaintiff

20  maintains that Spills 60-68 are from the same source and are of the same nature as those spills

21  included in its notice letter.  Plaintiff is correct.  The regulation does not require that plaintiffs "list

22  every specific aspect or detail of every alleged violation." *Bosma Dairy*, 305 F.3d at 951 (quoting

23  *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)).  "The key

24  language in the notice regulation is the phrase 'sufficient information to permit the recipient to

25  identify' the alleged violations and bring itself into compliance." *Id.* at 951. Notice is sufficient if it

26  is specific enough "to give the accused company the opportunity to correct the problem." *Id.* at 952

27  (quoting *Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997)).

28

In *Bosma Dairy*, the plaintiff listed dates of violations in its notice letter and then added additional dates of similar violations in its complaint. *Bosma Dairy*, 305 F.3d at 951-52. Because the additional violations were "from the same source, were of the same nature, and were easily identifiable," the court found the plaintiff's notice adequate. *Id.* at 953. Therefore, the Court holds in this case that, in addition to the specific dates of violations listed in its notice letter, Plaintiff can pursue claims for such violations on other dates after the notice letter was sent. Accordingly, the Court DENIES Defendant's request to dismiss Spills 60-68.

    6.    Conclusion

Based on the analysis above, the Court finds that Plaintiff has standing to bring this lawsuit. Specifically, Plaintiff has shown that: (1) it has suffered an "injury in fact" that is concrete and particularized, and actual or imminent, (2) the injury is fairly traceable to the challenged action of Defendant; and (3) it is likely that the injury will be redressed by a favorable decision. Further, Plaintiff has standing to bring suit on behalf of its members as a membership organization. Finally, the Court also finds that Plaintiff provided adequate notice pursuant to 33 U.S.C. § 1365. Having established that Plaintiff has standing to sue, the Court now turns to the merits of Plaintiff's motion.[6]

D.    Whether There is No Genuine Dispute that Defendant's 68 SSOs Discharged Pollutants to Surface Waters

In its motion, Plaintiff argues that there is no genuine dispute that 68 SSOs from Defendant discharged pollutants to surface waters. Specifically, Plaintiff maintains that Defendant's own certified and internal reports establish that Defendant discharged 23 SSOs, lasting a total of 34 days, to surface waters, and that it spilled 45 SSOs that reached the MS4 and subsequently discharged to surface waters. Plaintiff argues that Defendant did not and cannot capture and return all pollutants from SSOs because it is not possible to completely eliminate all pollutants from SSOs once they reach the storm drain.

In response, Defendant argues that there are material factual issues because it denies that the spills reached waters of the United States. In addition, Defendant argues that several of the surface

---

[6] While the Court finds Plaintiff has met the threshold requirement of standing, it will have to prove at trial its ultimate entitlement to relief.

United States District Court

For the Northern District of California

1    waters at issue are considered to be part of the area's MS4 and, as such, discharges from the MS4

2    would be considered a permitted discharge under the October 14, 2009 jurisdiction-wide NPDES

3    permit issued by the Regional Board.  Defendant further argues that, based on Plaintiff's own expert,

4    a genuine issue exists as to whether a spill can be fully captured and returned to the sanitary sewer

5    system.  Finally, Defendant argues that Plaintiff has provided no proof that each of the multiple-day

6    spills reached waters of the United States on each multiple day.

7         To establish a violation of the Act's NPDES requirements, a plaintiff must prove that (1) a

8    person (2) discharged (3) a pollutant (4) to navigable waters of the United States (5) from a point

9    source (6) without a permit.  *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d

10   305, 308 (9th Cir. 1993) (internal citation omitted).  Three of the elements – (1) Plaintiff is a person

11   under the CWA, (2) sewage is a pollutant, and (3) Defendant's Collection System and the MS4 are

12   point sources – are not in dispute.  Specifically, it is undisputed that Plaintiff is a person under the

13   CWA.  "The term 'person' means an individual, corporation, partnership, association, State,

14   municipality, commission, or political subdivision of a State, or any interstate body."  33 U.S.C. §

15   1362(5).  It is also undisputed that sewage is a pollutant.  *See* 33 U.S.C. § 1362(6) (The term

16   pollutant includes sewage).  It is also undisputed that Defendant's Collection System and the MS4

17   are point sources.  "Point source" is defined as: "any discernible, confined and discrete conveyance,

18   including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants

19   are or may be discharged."  33 U.S.C. § 1362(14).  Paragraph 25 of Plaintiff's Complaint alleges:

20   "The Collection System consists of pipes and other manmade conveyances, and is a point source

21   under the Clean Water Act."  Compl. ¶ 25, Dkt. No. 1.  In its Answer, Defendant admits this

22   allegation.  Answer ¶ 25, Dkt. No. 11.  Paragraph 37 of Plaintiff's Complaint alleges: "The MS4s

23   owned and operated by the County and the Municipalities are point sources under the Clean Water

24   Act."  Compl. ¶ 37, Dkt. No. 1.  Defendant also admits this allegation.  Answer ¶ 37, Dkt. No. 11.

25   Accordingly, this element is undisputed.

26        The remaining elements are contested.

27

28

United States District Court

For the Northern District of California

1.  <u>Discharge</u>

Plaintiff must show no genuine dispute of fact exists that Defendant's SSOs discharged pollutants to surface waters. Pursuant to the CWA, "[t]he term 'discharge of a pollutant' and the term 'discharge of pollutants' each means (A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). Thus, the discharge of sewage would satisfy this element.

a.  <u>SSOs that Plaintiff Alleges Discharged Directly to Surface Waters</u>

Plaintiff argues that 23 of Defendant's SSOs discharged pollutants directly into surface waters. Specifically, Plaintiff contends that the CIWQS reports Defendant submitted under penalty of perjury and Defendant's own internal reports provide conclusive evidence of these discharges. Plaintiff alleges that Defendant's certified reports and admissions prove that 6 spills (Spills 41, 51, 52, 61. 64, and 65) discharged to San Francisquito Creek. Next, Plaintiff alleges Defendant's certified reports prove the following SSOs reached surface waters: 1 spill (Spill 63) to West Point Slough; 8 spills (Spills 5, 7, 19, 31, 38, 48, 54, and 59) to Atherton Channel; 3 spills (Spills 43, 44, 47) to San Francisquito Creek; 2 spills (Spills 6 and 32) to Corte Madera Creek; and 1 spill (Spill 9) went to Los Trancos Creek. Finally, Plaintiff allege that Defendant's internal reports establish that 3 spills reached surface waters: 1 spill (Spill 33) to Atherton Channel; 1 spill (Spill 13) discharged to Redwood Creek; and 1 spill (Spill 1) discharged to Corte Madera Creek.

Defendant's arguments in its opposition are generalized and do not address each specific SSO; accordingly, the Court shall address these arguments first prior to a review of the individual SSOs. As to its certified reports, Defendant argues that genuine disputes exist because the CIWQS reporting system allows entities to modify their reports based on new or corrected information. However, Defendant fails to raise any genuine issue of dispute. Notably, Defendant does not challenge the certification of the reports, nor does it show that the reports were in fact changed. "A monitoring report that shows a water sample with pollutant discharges in excess of permit limits is conclusive evidence of a violation." *Inland Empire Waterkeeper v. Uniweb, Inc*., 2008 WL 6098645, *9 (C.D. Cal. 2008) (citing *Sierra Club v. Union Oil Co.*, 813 F.2d 1480, 1491 (9th Cir.

1    1987), vacated on other grounds, 485 U.S. 931 (1988), reinstated with minor amendment, 853 F.2d

2    667 (9th Cir. 1988)).  "A defendant may not impeach its own publicly filed reports which are

3    'submitted under penalty of perjury.'"  *Id.* (quoting *Save Our Bays & Beaches v. City & Cnty. of*

4    *Honolulu*, 904 F.Supp. 1098, 1138 (D. Haw. 1994)).  Thus, the Court finds that Defendant's

5    certified reports are properly considered.

6          Defendant further argues that its internal reports are merely for internal tracking and not

7    submitted to any outside entity or certified as accurate.  However, internal reports may be considered

8    admissions.  *Commercial Credit Group, Inc. v. Falcon Equip., LLC*, 2010 WL 144101, *12 (W.D.

9    N.C. 2010) (finding that the defendant's invoices, which contained statements made by the

10   defendant's employees, constitute an admission by a party opponent); *see also* Fed. R. Evid.

11   801(d)(2)(A), 801(d)(2)(c), 803(6).  Defendant offers no reason not to do so here.

12         Finally, Defendant states that it has "inadequate space to go into detail about each of the

13   spills," but directs the Court's attention to the Declaration of John Simonetti, paragraphs 7-15 and

14   the Declaration of John Larson, paragraphs 7-12.  The Court has also reviewed these declarations,

15   and finds that neither declaration contradicts the evidence submitted by Plaintiff related to the actual

16   content of the reports.  Neither Mr. Larson nor Mr. Simonetti challenges the certification of the

17   reports or the reports' statements that the spills reached waters.  As to evidence other than certified

18   reports, the Court shall address the Larson and Simonetti declarations as relevant below.

19         The Court shall now consider each set of spills in turn.

20                     i.    Spills 41, 51, 52, 61, 64, and 65

21         Plaintiff argues that Defendant's certified reports establish that between October 3, 2004 and

22   the present, Defendant discharged 6 SSOs to San Francisquito Creek.  Plaintiff further argues that

23   Defendant's responses to Plaintiff's Requests for Admission establish these discharges.

24         The Court finds that Defendant's certified reports establish without dispute discharges to San

25   Francisquito Creek for all six SSOs - Spills 41, 51, 52, 61, 64, and 65.  Hunt Decl. Exs D-41 at 988,

26   Dkt. No. 92 (overflow into private storm system which flows to San Francisquito Creek); D-51 at

27   1117, Dkt. No. 94 (Final spill destination: San Francisquito Creek to San Francisco Bay); D-52 at

28   1175, Dkt. No. 94 (Final spill destination: SSO down hillside into the San Francisquito Creek); D-61

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   at 1374, Dkt. No. 93 (Final spill destination: Storm drainage system to a drainage ditch to San

2   Francisquito Creek); D-64 at 1427, Dkt. No. 93 (Final spill destination: San Francisquito Creek

3   which flows to the San Francisco Bay); D-65 at 1435, Dkt. No. 93 (Final spill destination: San

4   Francisquito Creek).

5        As noted above, Defendant argues that genuine disputes exist because the CIWQS reporting

6   system allows entities to modify their reports based on new or corrected information.  Notably,

7   Defendant does not challenge the certification of the reports, nor does it show that the reports were

8   in fact changed.  Further, as stated above, Defendant may not impeach its own publicly filed reports

9   which are submitted under penalty of perjury.  *Inland Empire*, 2008 WL 6098645, at *9.  In any

10  event, with respect to this and many other SSOs, Defendant has submitted no contrary evidence

11  rebutting Plaintiff's evidence.  Mere denial in response to an RFA is not evidence.[7]  The evidence

12  which was submitted – *e.g.* Declarations of Simonetti and Larson – fail to rebut Plaintiff's evidence

13  on these spills.  Defendant's argument is without merit.

14       The Court finds that no genuine dispute exists as to SSOs 41, 51, 52, 61, 64, and 65, and that

15  these spills discharged to San Francisquito Creek.

16                    ii.   Spill 63

17       Plaintiff argues that Defendant's certified reports establish that it discharged one SSO (Spill

18  63) to West Point Slough.  As Defendant's report states that the final destination of the spill was

19  "West Point Slough then to the SF Bay," Hunt Decl. Ex. D-63 at 1418, Dkt. No. 93, the Court finds

20  that no genuine dispute exists as to SSO 63, and that this spill discharged into West Point Slough.

21

22

23  ─────────────

24       [7] Indeed, with the exception of RFA No. 288, Hunt Decl., Ex. B at 93, Dkt. No. 83 ("the spill was contained to the storm drain system and there was no evidence that the spill reached a creek, channel, culvert or water of the United States"), Defendant's own responses also establish that the

25  spills reached San Francisquito Creek.  *Id.* at 113 (RFA Resp. 352) ("an estimated 8,160 gallons flowed into the storm drain system that connects to San Francisquito Creek"); *Id.* at 116 (RFA Resp.

26  361) ("this spill flowed down a hillside and into San Francisquito Creek"); *Id.* at 124 (RFA Resp. 386) ("75 gallons reached a storm drainage system that flowed through a drainage ditch to San

27  Francisquito Creek); at 129-30 (RFA Resp. 403) ("portions of this spill saturated into soil and the remainder flowed to San Francisquito Creek); *Id.* at 132-33 (RFA Resp. 412) ("the non-recovered

28  portion of this spill flowed to a storm drain connected to San Francisquito Creek").

United States District Court
For the Northern District of California

iii.     <u>Spills 5, 7, 19, 31, 38, 48, 54, and 59</u>

The Court also finds that Defendant's reports establish that eight SSOs discharged to Atherton Channel: Spills 5, 7, 19, 31, 38, 48, 54, and 59.  Hunt Decl. Ex. D-5 at 565, Dkt. No. 85 (SSO flowed into the Atherton Channel); D-7 at 620, Dkt. No. 85 (same); D-19 at 801, Dkt. No. 87 (same); D-31 at 889, Dkt. No. 91 (same); D-38 at 948, Dkt. No. 91 (same); D-48 at 1062, Dkt. No. 92 (same); D-54 at 1224, 1226, 1229, 1232, Dkt. No. 94 (same); D-59 at 1326, 1331, Dkt. No. 94 (same).

The Court finds that no genuine dispute exists as to SSOs 5, 7, 19, 31, 38, 48, 54, and 59, and that these spills discharged to Atherton Channel.

iv.     <u>Spills 43, 44, and 47</u>

Plaintiff also contends that Defendant's reports establish that SSOs 43, 44, and 47 discharged to San Francisquito Creek.  For all three of these SSOs, on the portion of the report that requires the preparer to determine whether there was an "Overflow to creek," all three reports have an "x" in the box next to this question.  Decl. Exs. D-43 at 1021, D-44 at 1030, D-47 at 1053, Dkt. No. 92.  However, none of the reports specify which creek received the overflow.  Further, the written portions of the reports seem somewhat contradictory.  As to SSO 43, Plaintiff cites to the Hunt Declaration at pages 1016 and 1021.  However, both pages state that the overflow was fully captured and returned to a sanitary sewer; neither page states anything about San Francisquito Creek.  Ex. D-43, Dkt. No. 92.  As to SSO 44, Plaintiff cites to the Hunt Declaration at pages 1026 and 1030.  Again, neither page refers to the San Francisquito Creek; both pages state that the SSO was contained to a culvert at the Andeta Easement.  Ex. D-44, Dkt. No. 92.  Finally, as to SSO 47, Plaintiff cites to the Hunt Declaration at pages 1048 and 1053.  Page 1048 states that the overflow was recovered from the drainage channel, while page 1053 states that a "Vactor" was set up immediately to vacuum the SSO before it would reach the storm inlet; again, neither page mentions San Francisquito Creek.  Ex. D-47, Dkt. 92.

Thus, based on the evidence before it, the Court cannot determine as a matter of law that SSOs 43, 44 and 47 spilled to San Francisquito Creek.

v.      Spills 6 and 32

As to SSOs 6 and 32, the Court finds that Defendant's reports establish that these spills discharged to Corte Madera Creek.  Hunt Decl. Ex. D-6 at 580, 584, Dkt. No. 85 (Receiving waters: Corte Madera Creek); Ex. D-32 at 902, Dkt. No. 91 (Receiving waters: Tributary to Corte Madera Creek).  Hunt Decl. Ex. D-6 at 580.  There is no evidence to the contrary.

The Court finds that no genuine dispute exists as to SSOs 6 and 32, and that these spills discharged to Corte Madera Creek and/or its tributaries.

vi.      Spill 9

The Court also finds that Defendant's reports establish that SSO 9 discharged to Los Trancos Creek.  Hunt Decl. Ex. D-9 at 650, 655, Dkt. No. 86 (Receiving waters: Los Trancos Creek to San Francisquito Creek).  Accordingly, the Court finds that no genuine dispute exists as to SSO 9 and that this spill discharged to Los Trancos Creek.

vii.      Spill 33

As to SSO 33, the Court finds that Defendant's reports establish that it discharged to Atherton Channel.  Hunt Decl. Ex. D-33 at 913, 915, Dkt. No. 91 (receiving waters: Atherton Channel).  Accordingly, the Court finds that no genuine dispute exists as to SSO 33 and that this spill discharged to Atherton Channel.

viii.      Spill 13

As to SSO 13, Plaintiff argues that it is undisputed that it discharged to Redwood Creek.  In support of this claim, Plaintiff cites to a handwritten informal report from Defendant.  In the note, the preparer provided the following information: "Troy [from the] town of Atherton was on site.  He told me this section of the storm drain ran into Redwood City Creek."  Hunt Decl. Ex. D-13 at 699, Dkt. No. 86.  Internal reports may also be admissible as an official record and in this instance as a party admission.  *Commercial Credit Group*, 2010 WL 144101, at *12; *see also* Fed. R. Evid. 801(d)(2)(A), 801(d)(2)(c), 803(6).  However, the note repeats a statement from an unknown individual that does not appear to be an agent of Defendant, and there is no indication as to the trustworthiness or reliability of this individual.  The statement constitutes hearsay-within-hearsay,

49

United States District Court

For the Northern District of California

1   and thus the Court will not consider this handwritten report admissible for purposes of this motion.

2   The report thus fails to establish as a matter of law that SSO 13 discharged to Redwood Creek.

3        Plaintiff also directs the Court's attention to page 708 of the Hunt Declaration but, while that

4   page contains a table of SSOs including SSO 13, it says nothing of Redwood Creek.  Thus, based on

5   the evidence before it, the Court cannot determine as a matter of law that SSO 13 discharged into

6   Redwood Creek.

7                          ix.     Spill 1

8        As to SSO 1, the Court finds that Defendant's reports establish that it discharged to Corte

9   Madera Creek.  Hunt Decl. Ex. D-1 at 530, 535, Dkt. No. 85 (Receiving waters: Corte Madera

10  Creek).  Accordingly, the Court finds that no genuine dispute exists as to SSO 1 and that this spill

11  discharged to Corte Madera Creek.

12                         x.      Conclusion

13       Based on the analysis above, the Court finds that: (1) no genuine dispute exists as to SSOs

14  41, 51, 52, 61, 64, and 65, and that these spills discharged to San Francisquito Creek; (2) no genuine

15  dispute exists as to SSO 63, and that this spill discharged into West Point Slough; (3) no genuine

16  dispute exists as to SSOs 5, 7, 19, 31, 38, 48, 54, and 59, and that these spills discharged to Atherton

17  Channel; (4) a genuine dispute exists as to whether SSOs 43, 44 and 47 spilled to San Francisquito

18  Creek; (5) no genuine dispute exists as to SSOs 6 and 32, and that these spills discharged to Corte

19  Madera Creek and/or its tributaries; (6) no genuine dispute exists as to SSO 9, and that this spill

20  discharged to Los Trancos Creek; (7) no genuine dispute exists as to SSO 33, and that this spill

21  discharged to Atherton Channel; (8) a genuine dispute exists as to whether SSO 13 discharged into

22  Redwood Creek; and (9) no genuine dispute exists as to SSO 1, and that this spill discharged to

23  Corte Madera Creek.

24              b.     SSOs that Plaintiff Alleges Reached the MS4 and Discharged to Surface

25                     Waters

26       Plaintiff next argues that Defendant's certified reports establish that 45 SSOs entered the

27  MS4.  And, as it is undisputed that the MS4 constitutes a "point source," Compl. & Answer ¶¶ 25,

28

United States District Court

For the Northern District of California

37, Dkt. No. 1, ¶ 11, Plaintiff further argues that there is no reasonable dispute that these 45 SSOs ultimately discharged from the MS4 to surface waters.

In response, Defendant argues that a genuine dispute of fact exists as to whether or not there was an actual discharge from the MS4 to surface waters.  Defendant argues that the data created by Plaintiff's engineer and through its field investigation, as well as the opinions reached by Dr. Bell as a result of that data, are not reliable.  Further, they are not conclusive because Defendant secured rebuttal opinions that confirm the existence of genuine disputes.  Defendant argues that a genuine dispute exists as to whether a spill can be fully captured and returned to the sanitary sewer system.[8]

As an initial matter, although Plaintiff discusses 45 SSOs in this section of its motion, one of those SSOs – Spill 63 – is also listed in the section regarding discharges to surface waters.  Thus, as the Court addressed SSO 63 above, *see* D(1)(a)(ii), *supra*, it need not address it here.

Further, the Court notes that there seems to be no dispute that the 44 remaining SSOs entered the MS4.  In its opposition, Defendant admits that "most of these spills reached the MS4."  Def.'s Opp'n at 14:26, Dkt. No. 97.  And, even though its concession is qualified by the use of "most," Defendant fails to present any specific evidence that any of the 44 SSOs did not enter the MS4.

          i.     Whether Plaintiff's Evidence Establishes the SSOs Discharged From the MS4 to Surface Waters

To establish that these 44 SSOs discharged from the MS4 to the waters of the United States, Plaintiff states that it obtained data on the MS4 within Defendant's Service Area via public records act requests, and provided that data to its engineer, who then generated maps of the MS4 and plotted the locations of the storm drains, the outlet pipes, SSOs, and the locations of MS4 discharges into surface waters.[9]  Bell Decl., ¶¶ 42-43, Dkt. No. 73; Kopecky Decl., ¶¶ 4-11, Dkt. No. 75.  Plaintiff states that the engineer then plotted the path of each of Defendant's SSOs from the origin through the MS4 to the point of discharge to surface waters.  Bell Decl., ¶¶ 41, 43, Dkt. No. 73.  Where

---

[8] Defendant also argues that a genuine dispute exists as to whether any discharges from the MS4 were permitted by the County MS4 permit.  This argument shall be addressed separately, in Section III(D)(3), *infra*.

[9] In its motion, Plaintiff refers generally to its "engineer," without naming the individual. Based on the citations provided, the Court assumes that Plaintiff is referring to Dr. Bell.

United States District Court

For the Northern District of California

1    Defendant's report did not contain the location of the relevant storm drains, Plaintiff states that its

2    field investigation confirmed the GPS location or address of each spill and then, using GPS,

3    identified the storm drains where the SSO entered the MS4.  Bell Decl., ¶¶ 43-44, Dkt. No. 73;

4    Kopecky Decl., ¶ 13, Dkt. No. 75.

5            Defendant argues that Dr. Bell's opinion is based on assumptions, not actual facts.  Thus,

6    Defendant argues that it would be improper to accept his opinions at the summary judgment stage.

7    For the reasons stated above, (*see* Section III(B)(3)(a)(i), *supra,* the Court agrees.  Even though Dr.

8    Bell's testimony in this regard is admissible under *Daubert*, on its face there are substantial factual

9    questions about the reliability of his conclusions and completeness of his data and reasoning that all

10   of these SSOs which entered the MS4 found their way to surface waters.  Dr. Bell's conclusions are

11   based in part upon supposition and inferences.  Because on a motion for summary judgment, all

12   reasonable inferences must be drawn *against* the moving party, the Court cannot find as a matter of

13   law that all SSOs which entered the MS4 reached waters of the United States.

14           There are additional reasons for denying partial summary judgment.  In his declaration, Mr.

15   John Larson states that Dr. Bell's opinion regarding the routes the SSOs flowed or were transported

16   through the MS4 ignores the contemporaneous records and the results of subsequent detailed

17   investigations made by Defendant that indicate that some of the SSOs were completely contained

18   and did not reach surface waters.  Larson Decl. ¶ 8, Dkt. No. 102.  Of the 44 SSOs at issue here,

19   Larson states that the SSOs that were completely contained include SSOs 3, 26, 27, 29, 30, 42, 46,

20   50, 55, 56, 57, 60, 66, 67, and 68.

21           A review of Defendant's records shows that this is true for some, not all, of the SSOs listed

22   by Mr. Larson.  The reports for SSOs 3, 26, 55, 56, 57, 66, 67, and 68 all indicate that the entire

23   overflow was contained.  Hunt Decl. Ex. D-3, Dkt. No. 85; D-26, Dkt. No. 90; D-55, D-56, D-57,

24   Dkt. No. 94; D-66, D-67, D-68, Dkt. No. 93.  Plaintiff argues that it is not feasible for Defendant to

25   completely capture and return all the sewage spilled during an SSO.  However, Defendant's reports

26   and the declaration of its expert create a disputed issue of fact.  Thus, given that Defendant's reports

27   for these eight SSOs appear to contradict Plaintiff's argument and the method described in its

28

52

United States District Court

For the Northern District of California

1    motion, the Court finds that a genuine dispute exists as to containment, at least for SSOs 3, 26, 55,

2    56, 57, 66, 67, and 68.[10]

3            Nonetheless, Plaintiff contends that Defendant's own reports conclusively establish the MS4

4    SSOS reached surface waters.  Accordingly, of the 44 MS4 SSOs in Plaintiff's motion, the Court

5    focuses on those SSOs for which Defendant's own reports establish a discharge to surface waters.

6                        ii.     SSOs That Spilled to the MS4 During or Immediately After a

7                                Significant Rain Event

8            Plaintiff addresses the 44 SSOs in two categories: (1) 24 SSOs that spilled to the MS4 during

9    or immediately after a significant rain event; and (2) 20 SSOs that reached the MS4 without a

10   significant rain event.  A "significant rain event" occurs if more than 0.1 inches of rain accumulated

11   during the calendar day, more than 0.5 inches fell on the previous day, or more than 1.0 inch fell two

12   days before.  Bell Decl. ¶ 50, Dkt. No. 73 (citing EPA, NPDES Storm Water Sampling Guidance

13   Document, July 1992; Nat'l Climatic Data Center, Palo Alto Weather Station, Station 046646, Dec.

14   19, 2010 ("EPA Guidance Document")).  The EPA established these criteria as part of its sampling

15   requirements to ensure that adequate flow would be discharged and to ensure that the resulting data

16   will accurately portray the most common conditions for each site.  EPA Guidance Document at

17   pp.15-18 (available at nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=20012RVG.txt, last viewed on

18   March 11, 2011).  Plaintiff states that it utilized these categories because pollutants contained in

19   SSOs that reached storm sewers or ditches when stormwater was flowing would have been

20   discharged to surface water.  Bell Decl. ¶ 51, Dkt. No. 73.  Plaintiff also contends that if sufficient

21   flow was not occurring at the time an SSO reached the storm sewer/ditch, the pollutants would

22   ultimately discharge to surface waters when sufficient flow later occurred in the storm sewer/ditch to

23   carry those pollutants to the surface water.  *Id.* ¶ 52.

24           Of the SSOs that spilled to the MS4 during or immediately after a significant rain event,

25   Plaintiff argues that Defendant's certified reports establish that the following SSOs spilled to the

26   _____

27           [10] As to SSO 57, one portion of the report states that the spill was contained before flowing to
     the San Francisquito Creek, Hunt Decl. Ex. D-57 at 1305, while the comments states that a spill kit
28   was set up in "the creek" and the creek was vacuumed.  Whether the comments establish that the
     spill did reach the creek creates a genuine dispute of fact.

United States District Court

For the Northern District of California

1   MS4 and discharged to San Francisquito Creek, Ravenswood Slough, Atherton Channel, Los

2   Trancos Creek, or Bayfront Canal ("the Surface Waters"): Spills 10, 15, 16, 37, 40, 49, 50, and 62.

3   While these reports might otherwise be sufficient to establish a discharge to surface waters, the

4   Court finds that Defendant's reports do not in this instance.  While the reports indicate that the spills

5   overflowed to a creek, channel, or culvert, they do not name any creek or channel which the Court

6   finds (*see* Section III(D)(2), infra ) constitutes surface waters.[11]  Absent these reports, Plaintiff's

7   proof that these spills reached the Surface Waters must be based on Dr. Bell's tracing analysis which

8   is not sufficient to establish his conclusions as a matter of law for the reasons stated above.

9          Furthermore, Defendant contends that certain discharges into a MS4 did not reach surface

10  waters because they were contained.  Defendant cites to the State Water Resources Control Board's

11  *Statewide General Waste Discharge Requirements for Sanitary Sewer Systems*, which provides that,

12  "In the event of an SSO, the Enrollee shall take all feasible steps to prevent untreated or partially

13  treated wastewater from discharging from storm drains into flood control channels or waters of the

14  United States by blocking the storm drainage system and by removing the wastewater from the

15  storm drains."  Pl.'s RJN Ex. B at 14-15, Dkt. No. 82.  Defendant contends that it did, in fact, take

16  all feasible steps to prevent discharge to waters, and that many of the spills were contained.  *See,*

17  *e.g.,* Larson Decl. ¶¶ 8-9, 12, Dkt. No. 102; Simonetti Decl. ¶¶ 8, 10, 14, Dkt. No. 100.  Thus, based

18  on the evidence before it, the Court finds that a genuine dispute exists regarding Spills 10, 15, 16,

19  37, 40, 49, 50, and 62.

20         Plaintiff also argues that Defendant's internal (as opposed to certified) reports establish that

21  the following SSOs spilled to the MS4 and discharged to the Surface Waters: Spills 2, 4, 8, 11-12,

22  14, 17-18, 20-25, 27, and 34.  Of these, the Court finds that Defendant's reports establish that SSO

23  14 discharged to surface water identified below as waters of the United States.  Hunt Decl. Ex. D-14

24  at 710, Dkt. No. 86 ("Vacuumed portion of the Atherton Channel where overflow entered the

25

26  _____

27        [11] As to SSO 15, the report states that the SSO entered the underground storm drainage
    system located on the property, and that the storm line discharges into the Atherton Channel, but it
28  does not state that the SSO did in fact discharge into the Atherton Channel.  Hunt Decl. Ex. D-15,
    Dkt. No. 86.

United States District Court

For the Northern District of California

1  channel.)  Defendant's report serves as an admission, and there is no evidence that SSO 14 was

2  contained before it reached Atherton Channel.

3      As to all other SSOs listed in this section, the Court finds that Defendant's internal reports do

4  not establish, on their own, that the spills discharged into the Surface Waters listed above.  While the

5  reports may state that the spills overflowed to a creek, channel, or culvert, they do not name any

6  creek or channel which constitutes surface waters.

7      Accordingly, the Court finds that no genuine dispute exists as to SSO 14, and concludes that

8  this spill discharged to Atherton Channel.  As to SSOs 2, 4, 8, 11-12, 17-18, 20-25, 27, and 34, the

9  Court finds that a genuine dispute of fact exists.

10                    iii.    SSOs That Spilled to the MS4 Without a Significant Rain Event

11      As to the SSOs that spilled to the MS4 without a significant rain event, Plaintiff argues that

12  Defendant's certified reports establish that the following SSOs spilled to the MS4 and discharged to

13  the Surface Waters listed above: Spills 29, 35, 39, 42, 45-46, 53, 58, and 60.  However, the Court

14  finds that Defendant's certified reports do not establish, on their own, that the spills discharged into

15  the Surface Waters listed above.  While the reports may state that the spills overflowed to a creek,

16  channel, or culvert, they do not name any of the Surface Waters.

17      Plaintiff also argues that Defendant's internal reports establish that the following SSOs

18  spilled to the MS4 and discharged to the Surface Waters: Spills 28 and 30.  However, the Court

19  finds that Defendant's internal reports do not establish, on their own, that the spills discharged into

20  the Surface Waters listed above.  While the reports may state that the spills overflowed to a creek,

21  channel, or culvert, they do not name any of the Surface Waters.

22      Plaintiff argues that an SSO that reaches the MS4 even in a dry period must be presumed to

23  reach surface waters because subsequent rain event will wash the pollutants through the MS4 to

24  surface waters.  Bell Decl. ¶ 52, Dkt. No. 73.  However, Plaintiff provides no persuasive case law

25  establishing such proposition.  While Plaintiff cites to *Sierra Club,* 813 F.2d at  1490-91, and

26  *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993),

27  those cases merely recognize that the CWA imposes strict liability for NPDES violations and does

28  not excuse "de minimis" or "rare" violations.  They do not establish that once an SSO hits an MS4,

55

United States District Court
For the Northern District of California

1    it is presumed to reach surface waters even *e.g.*, in the face of a clean up effort.  Accordingly, absent

2    clear authority on this issue, the Court is disinclined to grant summary judgment based on this

3    theory.

4          Accordingly, the Court finds that genuine disputes of fact exist as to SSOs 28-30, 35, 39, 42,

5    45-46, 53, 58, and 60.

6                              iv.    Conclusion

7          Based on the analysis above, the Court finds that (1) a genuine dispute exists as to whether

8    the following SSOs spilled from the MS4 and discharged into surface waters: 2- 4, 8, 11-12, 17-18,

9    20-30, 34-35, 39, 42, 45-46, 53, 55-58, 60, and 66-68; and (2) no genuine dispute exists that SSO 14

10   discharged to Atherton Channel.

11                       c.    Multiple Spill Days

12         Finally, Plaintiff argues that five of the SSOs discharged for more than one day based on the

13   total overflow time listed in Defendant's reports: SSOs 7 (approx. 57 hours), Hunt. Decl., Ex. D-7 at

14   620, Dkt. No.85; 38 (approx. 26.5 hours), Ex. D-38 at 948, Dkt. No. 91; 51 (approx. 33 hours), Ex.

15   D-51 at 1118, 1125, Dkt. No. 94; 54 (approx. 24.5 hours), Ex. D-54 at 1225, Dkt. #94; 64 (approx. 2

16   hours, but over two calendar days), Ex. D-64 at 1428, Dkt. No. 93.

17         In its opposition, Defendant argues that there is no permit or statutory definition of "day,"

18   and thus there is a legal and factual dispute over the definition of a "day" for spills that occurred

19   over multiple calendar days.  Defendant's argument appears to be directed only at SSO 64, which

20   took place over two calendar days – beginning on April 30, 2010 at 10:54 p.m. and ending on May

21   1, 2010 at 12:53 a.m. – but only lasted approximately two hours.  Defendant argues that the Court

22   should count only each 24-hour period as a day, instead of each calendar day.

23         While neither party provided legal citations defining a "day" in this context, Defendant

24   directs the Court's attention to *Sierra Club v. City and County of Honolulu*, 2008 WL 3850495, at

25   *11 (D. Haw. 2008).  In that case, the court considered the definition of a "day" in the context of the

26   CWA.  *Id.*  The Court noted, like here, that the parties provided no legal authority on the definition,

27   but it counted only each 24 hour period, rather than a calendar day, in favor of the non-moving

28   party.  *Id.*  The Court finds this standard appropriate.  Based on the hours listed above, the Court

56

1  finds as a matter of law that SSO 64 occurred in one day, SSO 7 occurred over three days, SSO 38

2  occurred over two days, SSO 51 occurred over two days, and SSO 54 occurred over two days.

3              d.        Conclusion

4        Based on this analysis, the Court finds that no genuine dispute of fact exists that 21 SSOs

5  discharged for a total of 26 days.  These SSOs are summarized as follows:

| SSO | Discharge Location | Days |
|-----|--------------------|------|
| 1 | Corte Madera Creek | 1 |
| 5 | Atherton Channel | 1 |
| 6 | Corte Madera Creek | 1 |
| 7 | Atherton Channel | 3 |
| 9 | Los Trancos Creek | 1 |
| 14 | Atherton Channel | 1 |
| 19 | Atherton Channel | 1 |
| 31 | Atherton Channel | 1 |
| 32 | Corte Madera Creek | 1 |
| 33 | Atherton Channel | 1 |
| 38 | Atherton Channel | 2 |
| 41 | San Francisquito Creek | 1 |
| 48 | Atherton Channel | 1 |
| 51 | San Francisquito Creek | 2 |
| 52 | San Francisquito Creek | 1 |
| 54 | Atherton Channel | 2 |
| 59 | Atherton Channel | 1 |
| 61 | San Francisquito Creek | 1 |
| 63 | West Point Slough | 1 |
| 64 | San Francisquito Creek | 1 |
| 65 | San Francisquito Creek | 1 |

///

///

///

2.      Waters of the United States

Next, Plaintiff must show that no genuine dispute exists that the surface waters which received Defendant's discharges are jurisdictional waters of the United States.  Plaintiff argues that nine bodies of water are all waters of the United States under the CWA: San Francisquito Creek, West Point Slough, Atherton Channel, Los Trancos Creek, Corte Madera Creek, Ravenswood Slough, Bayfront Canal, Redwood Creek, and Bovet Creek.[12]

In response, Defendant provides little in the way of quantitative or even specific qualitative evidence to dispute Plaintiff's evidence related to the individual bodies of water.  The Court shall address that evidence below in its analysis of each body of water.  However, Defendant argues generally that evidence shows portions of the creeks were dry at the time of some spills, and that some of the creeks regularly run dry.  Based on this, Defendant argues that a genuine dispute exists as to the duration and flow of that water at the time of the alleged spills, and thus the classification of particular bodies as waters of the United States are genuinely disputed.

Pursuant to EPA regulations, "Waters of the United States" means all waters which are subject to the ebb and flow of the tide; waters from which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or tributaries of waters identified as [waters of the United States]."  40 C.F.R. § 122.2 ("Definitions") (defining "Waters of the United States," 33 U.S.C. § 1362(7)).  Thus, "a body of water need not, itself, be navigable in order to be one of the waters of the United States."  *United States v. Moses*, 496 F.3d 984, 988 (9th Cir. 2007).  Instead, the CWA includes "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams) . . . [and] [t]ributaries of [such] waters."  33 C.F.R. § 328.3(a).  Further, "a tributary of waters of the United States is itself a water of the United States."  *Moses*, 496 F.3d at 989 n.8.  And, "a seasonally intermittent stream which ultimately empties into . . . a water of the United States can, itself, be a water of the United States."  *Id.*; *see also Rapanos*, 547 U.S. at 732-33 n.5 (Scalia, J.)

_____

[12] Based on the analysis above, the Court finds that no genuine dispute exists that at least one SSO discharged into San Francisquito Creek, West Point Slough, Atherton Channel, Los Trancos Creek, and Corte Madera Creek.  However, in an effort to streamline the trial in this matter, the Court shall also make a determination as to the other bodies of water at issue – Ravenswood Slough, Bayfront Canal, Redwood Creek, and Bovet Creek.

1  ("We also do not necessarily exclude *seasonal* rivers, which contain continuous flow during some

2  months of the year but no flow during dry months.").  Thus, even a creek which is dry for months

3  may constitute a tributary that is a Water of the United States.

4         Contrary to Defendant's argument, the CWA does not require that a body of water have a

5  continuous flow for it to be a Water of the United States.  As stated above, the CWA includes

6  intermittent bodies of water.  33 C.F.R. § 328.3(a); *see also Moses*, 496 F.3d at 989 ("a seasonally

7  intermittent stream which ultimately empties into . . . a water of the United States can, itself, be a

8  water of the United States"); *Rapanos*, 547 U.S. at 732-33 n.5 (Scalia, J.) ("We also do not

9  necessarily exclude *seasonal* rivers, which contain continuous flow during some months of the year

10 but no flow during dry months.").  Defendant cites to *Rapanos* for the proposition that it creates a

11 "genuine issue of fact or law" on this issue.  In *Rapanos*, the Court defined Waters of the United

12 States as follows: "'[T]he waters of the United States' includes only those relatively permanent,

13 standing or continuously flowing bodies of water forming geographic features that are described in

14 ordinary parlance as streams, oceans, rivers, and lakes.  The phrase does not include channels

15 through which water flows intermittently or ephemerally, or channels that periodically provide

16 drainage for rainfall.  *Rapanos*, 547 U.S. at 739 (citation, internal quotations, ellipses, and brackets

17 omitted).  However, the Court held that the term "relatively permanent" does not necessarily exclude

18 streams, rivers, or lakes that might dry up in extraordinary circumstance, such as a drought, nor does

19 it exclude seasonal rivers that contain continuous flow *during some months* of the year but no flow

20 during dry months.  *Id.* at 733 n. 5 (emphasis added).  Accordingly, *Rapanos* does not exclude

21 waters that sometimes run dry, and the Court's analysis thus focuses on each individual body of

22 water at issue here.

23              a.   San Francisquito Creek

24         As to San Francisquito Creek, Plaintiff presents evidence that the existing beneficial uses of

25 San Francisquito Creek include both warm and cold freshwater habitats, fish migration, fish

26 spawning, and wildlife habitat.  Bell Dec., ¶ 30, Dkt. No. 73; Hunt Dec, Exh. F at 1484-85 (Basin

27 Plan).  Plaintiff also offers evidence that San Francisquito Creek has a monthly mean discharge five

28 miles downstream of Searsville Lake that ranges between 0.11 cubic feet per second ("cfs") and 86.7

United States District Court

For the Northern District of California

1  cfs, is tidally affected as far upstream as East Bayshore Road.  Id.; Hunt Decl. ¶ 14, Ex. I, Dkt. No.

2  88 (citing United States Geological Survey, Water Data Report 2009, 11164500 San Francisquito

3  Creek at Stanford University, CA).  The creek supports steelhead trout, thereby requiring continuous

4  water flow during spawning season. Id. ¶¶ 30, 33. In addition, Defendant admits in its responses to

5  Plaintiff's requests for admission ("RFA") that the state and federal governments consider San

6  Francisquito Creek to be waters of the United States.  Hunt Dec., Ex. B at 7-8, RFA Resp No. 10,

7  14, Dkt. No. 83.

8       In response, Defendant argues that its responses to Plaintiff's requests are not an admission

9  that San Francisquito Creek is a water of the United States.  Defendant also argues that Plaintiff's

10 allegations that a portion of this creek is tidally affected and may seasonally support steelhead trout

11 does not provide proof that the segment of the creek into which an SSO may have flowed is a water

12 of the United States.  Defendant further argues that evidence shows that portions of the San

13 Francisquito Creek were dry at the time of some spills at issue here.

14      First, as to Plaintiff's requests for admission, the Court finds that Defendant's responses are

15 not an admission that San Francisquito Creek is a water of the United States.  Plaintiff cites to

16 Defendant's responses to RFA Numbers 10 and 14.  RFA No. 10 requests: "Please admit that San

17 Francisco Bay is a WATER OF THE UNITED STATES."  Bell Decl. Ex. B at 6:19, Dkt. No. 83.

18 Defendant responded that it "admits that the state and federal government may consider the San

19 Francisco Bay to be a 'water of the United States.'"  Id. at 6:23-24.  RFA No. 14 requests: "Please

20 admit that San Francisquito Creek is a WATER OF THE UNITED STATES."  Id. at 7:22.

21 Defendant responded that it "admits that the state and federal government may consider the San

22 Francisquito Creek or portions thereof to be a 'water of the United States.'"  Id. at 7:26-28.  An

23 admission that state and federal governments may consider the creek to be a water of the United

24 States is not an admission by Defendant that this creek is actually a jurisdictional water of the

25 United States.

26      As to Defendant's other arguments, the Court finds that they do not create a genuine dispute

27 of fact.  Regarding Defendant's argument disputing whether portions of the creek are tidally affected

28 and may seasonally support steelhead trout, Defendant offers no evidence to support its argument or

1    to challenge the evidence Plaintiff has presented.  The point about the steelhead trout is that it

2    establishes a connection at least seasonally between San Francisquito Creek and the Bay.  While San

3    Francisquito Creek may sometimes run dry, that does not establish that it cannot be considered a

4    Water of the United States.  *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at

5    732-33 n.5.  Moreover, Defendant points to no evidence showing that the creek was dry for SSOs

6    41, 51, 52, 61, 64, and 65, which are the six SSOs that Plaintiff has established discharged to the

7    creek.

8            Plaintiff has provided specific evidence showing that San Francisquito Creek is a tributary

9    that regularly empties into the Water of the United States and is thus itself a water of the United

10   States under the CWA.

11                    b.        West Point Slough

12           As to West Point Slough, Plaintiff provided evidence that it is subject to the ebb and flow of

13   the tides, and it is capable of fish and shellfish harvest.  Bell Decl. ¶ 37, Dkt. No. 73 ("Westpoint

14   Slough is tributary to San Francisco Bay and is [subject to] tidal ebbs and flows year round.") (citing

15   California Regional Water Quality Control Board, San Francisco Bay Region, *San Francisco Bay*

16   *Basin (Region 2), Water Quality Control Plan (Basin Plan), Section 2.2.1*, Dec. 31, 2010; Hunt

17   Decl. ¶ 11, Ex. F at 1484, Dkt. No. 88)).

18           Defendant does not dispute Plaintiff's evidence.  In fact, its only challenge related to

19   Westpoint Slough is the generalized argument discussed above that it "may" run dry for part of the

20   year.  However, the fact that it may sometimes run dry does not establish that it cannot be

21   considered a Water of the United States.  *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989;

22   *Rapanos*, 547 U.S. at 732-33 n.5.  And, even if it does run dry, Defendant provides no evidence that

23   it ran dry at the time of SSO 63.

24           Accordingly, as Plaintiff has provided specific evidence showing that West Point Slough is a

25   Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

26   issue for trial, the Court finds that Westpoint Slough is a Water of the United States under the CWA.

27

28

United States District Court
For the Northern District of California

      c.    <u>Atherton Channel</u>

As to Atherton Channel, Plaintiff provides the following evidence:  the lower portion of Atherton Channel is subject to the ebb and flow of the tides in San Francisco Bay, and this tidal connection is demonstrated by three tide gates controlling tidal flow between Atherton Channel and West Point Slough.  Bell Decl. ¶ 35, Dkt. No. 73.  Plaintiff also points out that there is no reasonable dispute that Atherton Channel is tributary to San Francisco Bay because it flows east into a series of tidal waters and then to San Francisco Bay.  *Id.*  Finally, Atherton Channel has a significant nexus with West Point Slough and San Francisco Bay in that it is hydrologically connected with West Point Slough and San Francisco Bay, thus affecting the chemical, physical, and biological integrity of those waters.  *Id.  See River Watch*, 496 F.3d at 1001 (finding that a "nexus" existed to confer jurisdiction where the body of water at issue affects the physical, biological and chemical integrity of the Russian River, a Water of the United States, thereby warranting protection as a Water of the United States under the CWA).

In response, Defendant again argues that Atherton Channel "may" run dry for part of the year.  However, the fact that it may sometimes run dry does not establish that it cannot be considered a Water of the United States.  *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.  And, even if it does run dry, Defendant provides no evidence that it ran dry at the time of SSOs 5, 7, 14, 19, 31, 33, 38, 48, 54, and 59.

Defendant also argues that Atherton Channel has man-made tidal gates that can shut off flow to the next waterway.  Without any evidence specific to Atherton Channel or related to the spills at issue, Defendant argues that tidal gates can shut off flow to the next waterway.  However, "the very purpose of a tidal floodgate is to control the ebb and flow of the tide," *Am. Dredging Co. v. Selleck*, 556 F.2d 180, 181 (3d Cir. 1977); *see also Moses*, 496 F.3d at 989 (man-made diversion altering stream flow does not change stream's status as water of the United States): *Jones v. Rose*, 2008 WL 552666, at *31 (D. Or. Feb. 28, 2008) (installation of tide gates restricted flow).  "[J]urisdiction may be asserted under the CWA if there is a hydrological connection between a source of pollutants and navigable waters, even in circumstances where that connection is 'artificial' rather than 'natural.'" *United States v. Adam Bros. Farming, Inc.*, 369 F. Supp. 2d 1166, 1174 (C.D. Cal. 2003); *Cal.*

United States District Court

For the Northern District of California

1   *Sportfishing Prot. Alliance v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1076 (E.D. Cal. 2002)

2   ("The fact that an underground pipeline conveys the water from one point to the other does not

3   create a hydrological disconnect . . . .").

4        Accordingly, as Plaintiff has provided specific evidence showing that Atherton Channel is a

5   Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

6   issue for trial, the Court finds that Atherton Channel is a Water of the United States under the CWA.

7                    d.     Los Trancos Creek

8        As to Los Trancos Creek, Plaintiff states that it is undisputed that Los Trancos is a tributary

9   of San Francisquito Creek and San Francisco Bay in that it flows into San Francisquito Creek after

10  passing over a diversion dam.  Bell Decl. ¶ 31, Dkt. No. 73 (citing California Regional Water

11  Quality Control Board, San Francisco Bay Region, *San Francisco Bay Basin (Region 2), Water*

12  *Quality Control Plan (Basin Plan), Section 2.2.1*, December 31, 2010; Hunt Decl. ¶ 11, Ex. F at

13  1484, Dkt. No. 88)).  Plaintiff further notes that Los Trancos Creek supports habitat for steelhead

14  trout.  *Id.* (citing San Francisquito Watershed Council, *Adult Steelhead Passage in the Bear Creek*

15  *Watershed*, July 2001, Hunt Decl. ¶ 13, Ex. H at 1513, Dkt. No. 88).

16       Defendant does not challenge Plaintiff's evidence.  In fact, its only challenge related to Los

17  Trancos Creek is the generalized argument discussed above that it "may" run dry for part of the

18  year.  Again, the fact that it may sometimes run dry does not establish that it cannot be considered a

19  Water of the United States.  *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at

20  732-33 n.5.  And, even if it does run dry, Defendant provides no evidence that it ran dry at the time

21  of SSO 9.

22       Accordingly, as Plaintiff has provided specific evidence showing that Los Trancos Creek is a

23  Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

24  issue for trial, the Court finds that Los Trancos Creek is a Water of the United States under the

25  CWA.

26                    e.     Corte Madera Creek

27       As to Corte Madera Creek, Plaintiff contends that there is no genuine dispute it is a Water of

28  the United States because it flows into San Francisquito Creek.  Bell Decl. ¶ 32, Dkt. No. 73 (citing

1   United States Geological Survey, Geographic Names Information System, Feature Detail Report for:

2   Corte Madera Creek, January 12, 2011; Hunt Decl. at ¶ 15, Ex. J, Dkt. No. 88; The Oakland

3   Museum of California, Guide to San Francisco Bay Area Creeks, Watershed Information Source,

4   http://www.museumca.org/creeks/1460-OMSFrancisquitoUpr.html#, last accessed January 23,

5   2011; Joint Powers Authority, San Francisquito Creek Watershed, July 2002; Hunt Decl. at ¶ 16, Ex.

6   K, Dkt. No. 88).  Plaintiff also points out that third party studies show that Corte Madera Creek

7   supports habitat for steelhead trout.  *Id.* (citing San Francisquito Watershed Council, *Adult Steelhead*

8   *Passage in the Bear Creek Watershed*, July 2001; Hunt Decl. at ¶ 13, Ex. H at 1513, Dkt. No. 88).

9       In response, Defendant again argues that Corte Madera Creek "may" run dry for part of the

10  year.  Given the evidence above, that assertion is insufficient to raise a genuine issue of fact.  *See* 33

11  C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.  And, even if it does

12  run dry, Defendant provides no evidence that it ran dry at the time of SSOs 1 and 32.  Defendant

13  also argues that Corte Madera Creek flows into a reservoir that is dammed.  However, as with the

14  Atherton Channel, man-made obstructions do not change the status of what would otherwise be a

15  Water of the United States.  *Moses*, 496 F.3d at 988 ("[I]t is doubtful that a mere man-made

16  diversion would have turned what was part of the waters of the United States into something else

17  and, thus, eliminated it from national concern.").

18      Accordingly, as Plaintiff has provided specific evidence showing that Corte Madera Creek is

19  a water of the United States, and Defendant has failed to set forth specific facts showing a genuine

20  issue for trial, the Court finds that Corte Madera Creek is a Water of the United States under the

21  CWA.

22          f.      Ravenswood Slough

23      As to Ravenswood Slough, Plaintiff provides evidence that it has tidal and ebbs and flows

24  year round.  Bell Decl. ¶ 36, Dkt. No. 73.  Ravenswood begins as a salt marsh and flows along the

25  Bay Trail into San Francisco Bay.  *Id.*  Thus, Plaintiff argues that Ravenswood's beneficial uses are

26  identical to those of the San Francisco Bay.  *Id.* (citing California Regional Water Quality Control

27  Board, San Francisco Bay Region, *San Francisco Bay Basin (Region 2), Water Quality Control Plan*

28  *(Basin Plan), Section 2.2.1*, Dec. 31, 2010; Hunt Decl. ¶ 11, Ex. F at 1484, Dkt. No. 88)).

1    Defendant nowhere challenges Plaintiff's evidence.  In fact, its only challenge related to

2    Westpoint Slough is the generalized argument discussed above that it "may" run dry for part of the

3    year.  However, that fact is not sufficiently to raise a genuine issue of fact.  *See* 33 C.F.R. § 328.3(a);

4    *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.

5    Accordingly, as Plaintiff has provided specific evidence showing that Ravenswood Slough is

6    a Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

7    issue for trial, the Court finds that Ravenswood Slough is a Water of the United States under the

8    CWA.

9                    g.    Bayfront Canal

10    As to Bayfront Canal, Plaintiff offers evidence that it is a Water of the United States because

11    it is subject to the ebb and flow of the tide and has a tide gate.  Bell Dec., ¶ 35 & Fig. 2, Dkt. No. 73.

12    Defendant nowhere challenges Plaintiff's evidence, except the generalized argument

13    discussed above that Bayfront Canal "may" run dry for part of the year.  However, the fact that it

14    may sometimes run dry does not establish that it cannot be considered a Water of the United States.

15    *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.  Further,

16    Defendant does not dispute that Bayfront has a tide gate, and "the very purpose of a tidal floodgate

17    is to control the ebb and flow of the tide,"  *Selleck*, 556 F.2d at 181; *see also Moses*, 496 F.3d at 989

18    (man-made diversion altering stream flow does not change stream's status as water of the United

19    States): *Rose*, 2008 WL 552666, at *31 (installation of tide gates restricted flow).

20    Accordingly, as Plaintiff has provided specific evidence showing that Bayfront Canal is a

21    Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

22    issue for trial, the Court finds that Bayfront Canal is a Water of the United States under the CWA.

23                    h.    Redwood Creek

24    As to Redwood Creek, Plaintiff provides the following evidence to establish that it is a Water

25    of the United States.  Redwood Creek is both a tributary creek and an inlet of San Francisco Bay.

26    Bell Dec., ¶ 34 & Fig. 2, Dkt. No. 73.  It is located northwest of Atherton Channel, and drains to San

27    Francisco Bay at Redwood Point after the confluence of Redwood Creek and Arroyo Ojo de Agua, a

28    major tributary to Redwood Creek.  *Id.*  The upper portions of Redwood Creek have dams that form

United States District Court

For the Northern District of California

1    small lakes, and is subject to the ebb and flow of the tide in San Francisco Bay up to a dam in the

2    upper reaches of the creek.  *Id.*  It has a continuous flow of water, with a monthly mean discharge at

3    Menlo Country Club ranging from 0.31 to 3.8 cfs.  *Id.*  Finally, Redwood Creek has a significant

4    nexus with San Francisco Bay: Redwood Creek is hydrologically connected with San Francisco

5    Bay, and its flows affect the chemical, physical, and biological integrity of those waters.  *Id.*; *see*

6    *also River Watch*, 496 F.3d at 1001 (finding that a "nexus" existed to confer jurisdiction where the

7    body of water at issue affects the physical, biological and chemical integrity of the Russian River, a

8    water of the United States, thereby warranting protection as a Water of the United States under the

9    CWA).

10          Defendant nowhere challenges Plaintiff's evidence, except the generalized argument

11   discussed above that Redwood Creek "may" run dry for part of the year.  However, the fact that it

12   may sometimes run dry does not establish that it cannot be considered a Water of the United States.

13   *See* 33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.  Further,

14   Defendant's assertion is speculative.  Plaintiff has presented evidence that it has a continuous flow

15   of water, with a monthly mean discharge at Menlo Country Club ranging from 0.31 to 3.8 cfs, and

16   Defendant does not dispute this evidence.

17          Accordingly, as Plaintiff has provided specific evidence showing that Redwood Creek is a

18   Water of the United States, and Defendant has failed to set forth specific facts showing a genuine

19   issue for trial, the Court finds that Redwood Creek is a Water of the United States under the CWA.

20                    i.    Bovet Creek

21          As to Bovet Creek, Plaintiff presents the following evidence.  Beneficial uses of Bovet Creek

22   include use as habitat for steelhead trout, thereby requiring continuous water flow during spawning

23   season. Bell Dec., ¶ 33, Dkt. No. 73.  There is a biological nexus because Bovet Creek is in the San

24   Francisquito Creek Watershed and contributes to extended riparian and aquatic habitat for the same

25   flora and fauna present in Los Trancos Creek and San Francisquito Creek.  *Id.*  Bovet Creek is

26   therefore a Water of the United States because of the hydrological, chemical and biological nexus

27   with Los Trancos Creek, San Francisquito Creek, Ravenswood Slough and San Francisco Bay.

28   *River Watch*, 496 F.3d at 1001 (finding that a "nexus" existed to confer jurisdiction where the body

United States District Court

For the Northern District of California

1    of water at issue affects the physical, biological and chemical integrity of the Russian River, a Water

2    of the United States, thereby warranting protection as a water of the United States under the CWA).

3         Defendant nowhere challenges Plaintiff's evidence, except the generalized argument

4    discussed above that Bovet Creek "may" run dry for part of the year.  Again, the fact that it may

5    sometimes run dry does not establish that it cannot be considered a Water of the United States.  *See*

6    33 C.F.R. § 328.3(a); *Moses*, 496 F.3d at 989; *Rapanos*, 547 U.S. at 732-33 n.5.

7         Accordingly, as Plaintiff has provided specific evidence showing that Bovet Creek is a Water

8    of the United States, and Defendant has failed to set forth specific facts showing a genuine issue for

9    trial, the Court finds that Bovet Creek is a Water of the United States under the CWA.

10              j.    Conclusion

11        Based on the analysis above, the Court finds that no genuine dispute exists, and that the

12   following are all Waters of the United States under the CWA: San Francisquito Creek, West Point

13   Slough, Atherton Channel, Los Trancos Creek, Corte Madera Creek, Ravenswood Slough, Bayfront

14   Canal, Redwood Creek, and Bovet Creek.

15        3.    NPDES Permit

16        Under the CWA, discharges to Waters of the United States violate Section 301(a) unless

17   authorized by Permit.  33 U.S.C. §§ 1311(a), 1342.  Compliance with a NPDES permit is deemed

18   compliance with the CWA.  33 U.S.C. § 1342(k).  Here, it is undisputed that there is an NPDES

19   permit for wastewater treatment issued by the Regional Board under SBSA's name.  Pl.'s RJN Ex.

20   O, Dkt. No. 82.  Pl.'s RJN Ex. A at 3, Dkt. No. 82 ("The Menlo Park Pumping Station and all

21   downstream facilities are owned and operated by [SBSA].  SBSA is a joint power authority of which

22   [Defendant] is a member.").  SBSA operates the treatment plant, while Defendant operates the

23   Collection System that conveys wastewater to the SBSA treatment plant.  Compl. & Answer ¶¶ 21-

24   23, 28-30, Dkt. Nos. 1, 11.  The SSOs at issue in this case were reported by Defendant from its

25   Collection System, and Defendant admits that it does not have a NPDES permit for its Collection

26   System.  *See* Def.'s Opp'n at 11:18-25, Dkt. No. 97 ("Baykeeper itself has alleged that '[b]ecause of

27   West Bay's status as a 'satellite system' West Bay does not have, nor could it obtain, a [NPDES]

28   Permit authorizing it to discharge sewage from its Collection System. . . . Thus, an injunction

1    requiring West Bay to receive an NPDES permit is not relief that can be feasibly granted and

2    complied with."); *see also,* Thorme Decl. Ex. D at 32:14-15 (Dep. of Deborah Self by Melissa

3    Thorme, counsel for Defendant.  Self: "West Bay does not have an NPDES Permit."  Thorme:

4    "Right.").

5            Plaintiff argues that Defendant does not have a NPDES permit authorizing sewer discharge

6    from its Collection System because the NPDES permit is held by SBSA and because the SBSA

7    permit does not apply to Defendant's Collection System.  Further, SBSA is the permit holder, not

8    Defendant.  Plaintiff thus argues that Defendant's discharges were made without a permit.

9            In response, Defendant argues that discharges from the MS4 which originated from the

10   Collection System are NPDES-permitted discharges.  Specifically, Defendant argues that the MS4 is

11   regulated by the NPDES permit – a Municipal Regional Stormwater NPDES permit, separate and

12   distinct from the SBSA waste treatment permit – issued by the Regional Board.  It contends that

13   several of the surface waters at issue (although it does not name any specifically) are considered to

14   be part of the MS4, and, as such, a discharge from the MS4 (including pollutants originating from

15   the Collection System) are covered by the MS4 permit.  The MS4 permit is issued to a number of

16   municipalities and counties, but Defendant is not a named permittee.  *See* Docket No. 120 (Ex. E)

17   (permit).  Defendant additionally argues that the MS4 is part of a municipality's waste treatment

18   system for stormwater and is therefore not considered Waters of the United States under the waste

19   treatment system exemption.  The Court considers each argument in turn.

20                   a.   MS4 Permit

21          Defendant contends that it is a permittee under the general MS4 NPDES permit, which

22   makes any SSO discharged through and from the MS4 a "permitted discharge" so long as it is within

23   the limits set by the permit.  Def.'s Opp'n 15:13-17:6, Dkt. No. 97.  At the March 9 hearing,

24   Defendant clarified its position that the MS4 permit tolerated some pollution and, so long as the SSO

25   did not violate the terms of the MS4 permit, it is a permitted discharge and thus not violative of the

26   CWA.

27          At the March 9, 2011 hearing on Plaintiff's motion, the Court informed the parties that their

28   arguments on this issue had not been fully briefed.  Further, on March 10, 2011, Defendant filed a

"Notice of New Authority," attaching a copy of the Ninth Circuit opinion, *Natural Res. Defense Council v. Cnty. of Los Angeles*, 2011 WL 815099.  Dkt. No. 112.  For these reasons, Plaintiff requested that the Court permit the parties to each file a supplemental brief addressing the following issues: (1) Whether the permit for the MS4 owned and operated by local municipalities applies to Defendant's discharges into the MS4; and (2) Whether Defendant's discharges of raw sewage into the MS4 are covered by the Waste Treatment System Exemption.  Dkt. No. 113.  The Court granted Plaintiff's request on March 15, 2011.  Dkt. No. 114.

On March 25, 2011, the parties filed their supplemental briefing.[13]  Dkt. Nos. 116, 119.  In its brief, Plaintiff argues that Defendant has no permit for its SSOs, and Defendant's discharges are not covered by a MS4 permit issued to third parties.  Dkt. No. 119.  Specifically, Plaintiff argues that the CWA requires a discharger to apply for and obtain permit coverage to discharge pollutants.  As Defendant is not named in the MS4 Permit and has never applied for such permit, Plaintiff argues that Defendant's SSOs are not governed and regulated by the MS4 Permit.  Plaintiff specifically contends that Defendant's argument that it is covered by the MS4 Permit is contrary to the process for obtaining permits under the CWA, and that third party permittees cannot vicariously authorize Defendant's SSOs.

In its supplemental briefing, Defendant argues that the MS4 Permit applies to its discharges into the MS4 because pollutants such as sewage are identified in the MS4 permit as being potentially discharged from the MS4, and measures were imposed to minimize the impacts of such discharges.  Dkt. No. 116.  Defendant further argues that Plaintiff cannot reasonably claim the contrary since it has argued in other cases that MS4 owners/operators are responsible for all pollutants conveyed, no matter the source.

---

[13] In addition to their supplemental briefing, both parties filed requests for judicial notice. The parties request that the Court take judicial notice of Regional Board orders and permits, U.S. Army Corps of Engineers guidance documents, comment letters from Plaintiff to the Regional Board regarding MS4 permits, NPDES permits issued to the City of Millbrae and Alameda, and excerpts of NPDES permits issued by the State Board.  Dkt Nos. 117, 120.  As neither party has raised any objections to the requests for judicial notice, and the requests are not subject to reasonable dispute in that they are capable of accurate and ready determination, the Court GRANTS the parties requests for judicial notice.

As to the last point, it is true that dischargers are not insulated from liability merely because they make illegal discharges via a system owned and operated by other entities.  For example, in *United States v. Ortiz*, 427 F.3d 1278, 1284 (10th Cir. 2005), investigators traced an illegal discharge from the Colorado River, up a storm drain owned and operated by a separate municipality, and to the defendant's facility.  The court held that the defendant violated the CWA by discharging pollution through the storm drain, even though it was owned and operated by another entity.  *Id.*  In *United States v. Velsicol Chemical Corp.*, 438 F. Supp. 945, 947 (D.C. Tenn. 1976), the court held that "[t]he fact that defendant may discharge through conveyances owned by another party does not remove defendant's actions from the scope of [the CWA]."  *Id.*  The CWA "does not distinguish between those who add and those who convey what is added by others – the Act is indifferent to the originator of water pollution."  *Id.* at 17.  In fact, the CWA bans "the discharge of any pollutant by any person" regardless of whether that "person" was the root cause or merely the current superintendent of the discharge."  *NRDC*, 2011 WL 815099 at *11.  (internal quotations and citation omitted).  So long as the MS4 is "the means by which the pollutants are ultimately deposited into a navigable body of water," Defendant can be held liable for those discharges, regardless of any permit.  *Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45-46 (5th Cir. 1980).  In *Rapanos*, the Supreme Court noted that the discharge of any pollutant into intermittent channels violates section 301(a) of the Clean Water Act even if the pollutant discharged from a point source does not emit "directly into" waters, but passes "through conveyances" in between.  *See Rapanos*, 547 U.S. at 743-44 (citation omitted).

The question here is whether Defendant can obtain the vicarious benefit of the MS4 permit issue to entities other than itself.  As noted above, the CWA generally prohibits the discharge of any pollutant into nagivable waters from any point source is covered by a NPDES permit.  *See NRDC*, 2011 WL 81509, at *3.  Plaintiff asserts that only the *permit holder* is entitled to the benefit of the permit, and it is undisputed that Defendant is not a permittee on the NPDES MS4 permit at issue.

The Court acknowledges that Defendant's argument is not necessarily foreclosed by the literal language of the CWA.  The relevant provision of the Act does not explicitly state that a permit covers only the permit holder and not other dischargers.  *See* 33 U.S.C. § 1342(a) (noting that "the

United States District Court

For the Northern District of California

1    Administrator may, after opportunity for public hearing, issue a permit for the discharge of any

2    pollutant" upon certain conditions).  But Defendant's position ultimately fails for several reasons.

3         First, as Plaintiff argues, the Ninth Circuit's recent decision in *NRDC* indicates that a

4    NDPES permit should be interpreted like a contract.  *See id.* at *9 (stating that "[w]e review a

5    permit's provisions and meaning as we would any contract or legal document").  Defendant is not a

6    party to the MS4 permit.  Nor is there anything to establish that Defendant is an intended third-party

7    beneficiary of the permit.  Accordingly, Defendant's attempt to claim the benefit of the NDPES

8    permit is problematic.  *Cf. California Sportfishing Protection Alliance v. California Ammonia Co.*,

9    No. CIV. S-05-0952 WBS JMF, 2007 U.S. Dist. LEXIS 8845, at *20-21 (E.D. Cal. Jan. 29, 2007)

10   (denying defendant's motion for summary judgment for failure to demonstrate that the Port's

11   NPDES permit applied to defendant; taking note that "[d]efendant does not point to any place in the

12   Port's NPDES permit stating that it covers defendant's activities").

13        Second, there is no authority to support Defendant's position.  Indeed, the case law strongly

14   suggests that Plaintiff's position is the correct one – that a permit covers only permittees.  As the

15   Supreme Court stated in *Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981), "Every point source

16   discharge is prohibited unless covered by a permit, which directly subjects the *discharger* to the

17   administrative apparatus established by Congress to achieve its goals."  (Emphasis added.)  The

18   Court appears to assume that the "discharger" must hold a permit.  In *Piney Run Preservation*

19   *Association v. County Commissioners of Carroll County*, 268 F.3d 255 (4th Cir. 2001) , the Fourth

20   Circuit likewise noted that, "as long as a *permit holder* complies with the CWA's reporting and

21   disclosure requirements, *it* may discharge pollutants not expressly mentioned in the permit."  *Id.* at

22   268 (emphasis added).  "The legislative history makes clear that Congress intended the NPDES

23   permit to be the only means by which a *discharger* from a point source may escape the total

24   prohibition of [§] 301(a)."  *Id.* at 265 (emphasis added).[14]  Permits are thus specific to the discharger.

25

_____

26        [14] Defendant's reliance on *NRDC* is misplaced.  The fact that the CWA does not distinguish
     between those who pollute directly and those who simply channel pollutants created by others, *see*
27   *NRDC*, 2011 WL 851099, at *17 (adding that "the Act is indifferent to the originator of water
     pollution"), does not address the issue of which persons or entities are entitled to the benefit of the
28   NPDES permit.

United States District Court

For the Northern District of California

1    Third, there are sound policy reasons why a permit holder only, and not other dischargers,

2  should be allowed to claim the benefit of the permit.  When a discharger becomes a permit holder, it

3  "directly subjects [itself] to the administrative apparatus established by Congress to achieve its

4  goals."  *Milwaukee v. Illinois*, *supra*, 451 U.S. at 318.  The permit holder is permitted to discharge

5  some pollutants because of the permit – the benefit – but then is obligated to assume corresponding

6  burdens as a result, including, but not limited to, monitoring and reporting obligations.  *See NRDC*,

7  2011 WL 815099, at *3 (noting that a "NPDES permit requires its holder – the 'permittee' – to

8  follow the requirements of numerous [CWA] provisions, which include effluent limitations, water-

9  quality standards, water monitoring obligations, public reporting mechanisms, and certain discharge

10  requirements").  As the Supreme Court noted in *Milwaukee, supra*, the permit is the means by which

11  regulators exercise detailed control over the discharger; the permit typically addresses the specific

12  context and situation of the permit holder/discharger.  451 U.S. at 320-23 and n.15.  Defendant's

13  position that a non-permittee can assume the benefit and protection of a permit is incompatible with

14  the CWA's *quid pro quo* scheme; under Defendant's position, a discharger would be allowed to

15  pollute and obtain the benefit of a permit without assuming the obligations and responsibilities of

16  that permit.

17                b.    Waste Treatment System Exemption

18    Defendant also claims that the MS4 is exempted from the definition of waters of the United

19  States because it constitutes a waste treatment system, and is therefore part of the "Waste Treatment

20  System Exemption."  Pursuant to 33 C.F.R. § 328.3(a)(8) and 40 C.F.R. § 122.2, "Waste treatment

21  systems, including treatment ponds or lagoons designed to meet the requirements of CWA . . . are

22  not waters of the United States."  "Claims of exemption, from the jurisdiction or permitting

23  requirements, of the CWA's broad pollution prevention mandate must be narrowly construed to

24  achieve the purposes of the CWA."  *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1001

25  (9th Cir. 2007) (citations omitted).  Defendant has the burden to prove that this exception applies.

26  *Id.* (citations omitted).  Here, the Court finds that the waste treatment system exemption is irrelevant

27  because it is intended to "exempt either water systems that do not discharge into waters of the

28  United States or waters that are incorporated in an NPDES permit as part of a treatment system."  *Id.*

United States District Court
For the Northern District of California

1   (citations omitted).  Defendant does not contend that the MS4 is a water system that does not

2   discharge into waters of the United States.  Nor is it part of a "treatment system."  The MS4 system

3   in Defendant's service area provides no treatment.  *See* Pl.'s Req. for Judicial Not. Ex. A at

4   11:13-19, Dkt. No. 120.  The waste treatment exception was meant to require dischargers "to meet

5   effluent discharge standards for discharges into their own closed system treatment ponds."  *Id.* at

6   1002.  As discussed above, there is no genuine dispute that SSO 14 reached Atherton Channel, and

7   therefore discharged into waters of the United States and not into a closed treatment pond or system.

8          Furthermore, as noted, the waste treatment permit at issue does not cover Defendant's

9   Collection System, and Defendant is not a named permittee.

10          The Court finds that Defendant's discharges occurred without a permit.

11                              **IV.   CONCLUSION**

12          The Court finds that no genuine dispute exists that Defendant's SSOs #'s 1, 5-7, 9, 14, 19, 31-

13   33, 38, 41, 48, 51-52, 54, 59, 61, and 63-65 were are discharges of a pollutant (sewage) to navigable

14   waters of the United States from a point source without a permit.

15          The Court **GRANTS** each party's request for judicial notice.  The Court **SUSTAINS IN**

16   **PART AND OVERRULES IN PART** Defendant's objections to Plaintiff's evidence as follows.

17   The Court:  (1) **OVERRULES** Defendant's objections to the declarations of fact witnesses Anna

18   Fairbank, Terry Blanchard, Dudley Kenworthy, and Andrea Kopecky; (2) **OVERRULES**

19   Defendant's objection to the corrected declaration of Deborah Self; (3) **OVERRULES** Defendant's

20   objection to the declaration of expert witness Bruce Bell; (4) **OVERRULES** Defendant's objection

21   to Exhibit A to Mr. Hunt's declaration; and (5) **SUSTAINS** Defendant's objection to and strike page

22   84 of Exhibit A to the Lucke declaration.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**United States District Court**
For the Northern District of California

1      For the reasons stated above, the Court hereby **GRANTS IN PART AND DENIES IN**

2 **PART** Plaintiff's motion for partial summary adjudication as follows: Plaintiff's motion as to SSOs

3 1, 5-7, 9, 14, 19, 31-33, 38, 41, 48, 51-52, 54, 59, 61, and 63-65 is **GRANTED**.  Plaintiff's motion

4 as to SSOs 2- 4, 8, 11-13, 17-18, 20-30, 34-35, 39, 42-47, 53, 55-58, 60, and 66-68 is **DENIED**.

5 The Court also **GRANTS** summary adjudication in finding the nine bodies of water which are the

6 subjection of Plaintiff's motion are Waters of the United States for purposes of the CWA.

7      This Order disposes of Docket Nos. 71, 82, 103, 104, 118 and 120.

8

9      IT IS SO ORDERED.

10

11 Dated:  May 23, 2011

12                                           _____

13                                           EDWARD M. CHEN
United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28